(No. 17408.—

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* WILLIAM WALLACE McCALLUM, Respondent.

*Opinion filed October 25, 1930—Rehearing denied Dec. 6, 1930.*

DUNN, C. J., STONE and DeYOUNG, JJ., dissenting.

JOHN L. FOGLE, (WILLIAM P. SIDLEY, HORACE K. TEN-NEY, SILAS H. STRAWN, AMOS C. MILLER, FRANCIS X. BUSCH, and CHARLES P. MEGAN, of counsel,) for relator.

John A. Bloomingston, and James J. Barbour, for respondent.

Mr. Justice Heard delivered the opinion of the court:

Relator, the Chicago Bar Association, in the name of the People, upon leave granted, filed an information, consisting of three counts, in this court to disbar respondent, William Wallace McCallum, for alleged improper conduct and practices as a lawyer. Respondent answered the information, denying the charges, and the cause was referred to a commissioner to take the evidence and report his conclusions. The commissioner found that the charge in the first count of the information had not been sustained and the charges in the second and third counts had been sustained, and he recommended such disciplinary action as this court might deem proper. Relator filed exceptions to the finding upon the first count and respondent filed exceptions to the findings on the other two counts.

The first count of the information charged respondent with prosecuting in the circuit court of Cook county a fraudulent claim for personal injuries against the Chicago, Burlington and Quincy Railroad Company knowing the same to be fraudulent.

The evidence shows that respondent was admitted to the bar in 1907 and has practiced in Chicago. During the last few years his practice has been confined almost exclusively to personal injury claims against public service corporations, and particularly against railroads in which the injuries occurred in interstate commerce. He maintains an office in which he has a stenographer and several male employees, among whom was his brother, who is not a lawyer. It is charged that the brothers are engaged in the practice of the law; that they and their male employees solicit personal injury cases, make contracts with injured persons and financially sustain their claimants pending trial. Respond-

ent was the attorney in several cases against the Chicago, Burlington and Quincy Railroad Company, which company will be referred to as the railroad company. Some of these cases were tried and others were settled. Attorneys who handled these cases for the railroad company decided to set a trap for respondent.

On the recommendation of certain Minneapolis attorneys, lawyers for the railroad company engaged D. L. Scanlan, who under the name of D. J. Donahue appears in this case. Scanlan and one Perry, a claim agent of the railroad company, put the plan into operation. Scanlan was to work as a switchman for the railroad company, was to be found in an apparently injured condition, and was to be taken to the Mercy Hospital, in Chicago. He was to simulate paralysis of the right arm and leg and was to retain respondent as his attorney. Scanlan, before the alleged injury, was taken by Perry to a physician who had been employed by the railroad company from time to time. This physician instructed Scanlan as to the nature of paralysis and how he should act if paralyzed. Scanlan was then taken to two other physicians and there demonstrated his ability to pretend paralysis. Among them was Dr. Sullivan, of Mercy Hospital, who was later in charge of Scanlan at that hospital. Dr. Sullivan was not informed as to the actual facts but was asked to examine Scanlan and diagnose his case. He tested him for paralysis by means of electricity and otherwise. He was not certain whether Scanlan was paralyzed or not. Shortly before the happening of the supposed accident Scanlan met Joe Hennessey, who was employed by respondent and was later in the employ of the railroad company. Scanlan was employed by the railroad company as a switchman under the name of Donahue. On November 5, 1924, he purposely took a cotterkey from the pin-lifter of a car, took hold of the pin-lifter and purposely fell to the ground. He bit his lip, and when he was found by the train crew blood was com-

ing from his mouth. He pretended to be partly uncon-
scious, paralyzed on his right side, and was removed to
Mercy Hospital. A day or two later he was visited by
Hennessey, whether at his request or not does not clearly
appear. Hennessey set to work to have the respondent em-
ployed to represent Scanlan in his claim for damages. In
a day or two Hennessey and the McCallum brothers called
at the hospital to see Scanlan. They were informed· by
the nurse that the patient could not have visitors and they
were requested to leave. On the evening of November 12
Scanlan was moved from Mercy Hospital to St. Luke's
Hospital. On the next day after he was removed a con-
tract was entered into between Scanlan and respondent
for the prosecution of his action for damages. Scanlan re-
mained in St. Luke's Hospital until November 29, when
he was removed to the Sheridan Plaza Hotel. Later he
was taken to the Parkway Hotel and finally to the Sherman
House, where he remained until the case was reached for
trial. All of the hospital bills, doctor bills, hotel and other
expenses were paid by the McCallums. After Scanlan was
removed from Mercy Hospital he was examined by two
physicians, both of whom testified on the trial. On Novem-
ber 18 suit was commenced by respondent as attorney for
Scanlan. Within a few days summons was served, a dec-
laration was filed and the cause was at issue. On Decem-
ber 9 a motion was made by respondent to advance the case
for trial. In support of this motion an affidavit was filed
by Scanlan and another by respondent, the substance of
which will later be considered. As a result of these affi-
davits the case was advanced and was finally called for
trial on February 11. Scanlan appeared in court in appar-
ently a crippled condition, with his right arm limp and
resting against his body, his right leg was dragging and he
supported himself with a cane, which he carried in his left
hand. Three physicians testified that in their opinion Scan-

lan was suffering from paralysis of the right side, involving the arm and leg; that such opinions were based on objective symptoms; that they were absolutely certain of their diagnosis, and that they could not have been fooled by Scanlan. One of them testified that in his opinion Scanlan had suffered a fracture at the base of the skull and a fracture of the fourth lumbar vertebra. After the trial had proceeded for two days Scanlan was called as a witness. He was asked whether he had previously been injured, and replied that he had; that several times he had falsely claimed to be injured, and that he had extorted money from railroads, including over $2000 from the Burlington road. The court called the attorneys and Scanlan into his chambers. Scanlan there stated that he was not crippled, that he had no injuries, and he demonstrated his condition by laying aside his cane, walking as a normal, healthy person and by freely using his right arm and hand. He informed the court that he was in the employ of the railroad company; that his suit was fictitious and was brought for the purpose of entrapping the McCallums. The attorney for the railroad company admitted that Scanlan was in his employ and that he knew all the time that this was a fictitious suit. The court ordered attachments against all of these parties and an exhaustive investigation was started, which lasted about two weeks. At the close of the investigation the court censured the attorneys for the railroad company who had caused the fraud to be perpetrated on the court, but did not impose any punishment for contempt. He held that the McCallums and Scanlan were guilty of contempt, and the McCallums were each fined $250 and Scanlan was sent to jail for one day.

The first count of the information grows out of a scheme to entrap respondent and is therefore subject to grave suspicion. Scanlan, who was the chief actor in the scheme, is a disreputable person, who has been engaged in fraudulent and criminal practices, and, except where he is corroborated,

is unworthy of belief. He testified that he revealed to respondent that he was not injured and was feigning paralysis and that respondent agreed to join him in the prosecution of a fraudulent claim against the railroad company. He contradicts himself many times during the course of his testimony and is contradicted on many important points by credible witnesses. Two witnesses testify that they were concealed in a closet in Scanlan's room at Mercy Hospital on the evening he was moved to St. Luke's Hospital, and that just before he was removed respondent had a conversation with Scanlan in which they talked about framing a case, and the witnesses could see, through an opening in the door, Scanlan demonstrating to respondent that he was not paralyzed. Respondent, his brother, the hospital employees, and the two men who carried Scanlan out of the hospital to the ambulance, all testify that respondent was not in Scanlan's room at the time this alleged conversation took place. Respondent's brother was in the room on this occasion and made the arrangements to move Scanlan from Mercy Hospital to St. Luke's Hospital.

Scanlan's feigning of paralysis was so perfect that he succeeded in deceiving several very reputable physicians, among them the head of the medical staff of a high-class hospital, and another physician, who was prominent in civic affairs, was physician for several railroads and had frequently appeared in court for defendants, among them the Burlington Railroad Company.

Several of Chicago's most reputable lawyers, including John D. Black, former president of the Illinois State Bar Association, whose firm represented the Michigan Central, the Chicago, Indianapolis and Louisville, the Chicago Great Western, the Chicago Junction and the Canadian Pacific railroad companies, and the receivers of the Chicago and Alton Railroad Company, who had known respondent ten or twelve years; Vernon W. Foster, district attorney for the Illinois Central Railroad Company, who had known

respondent during all the years of respondent's practice; Nelson J. Wilcox, an attorney for the Chicago and Northwestern Railroad Company, who had known respondent five or six years; John L. McInerney, an attorney representing the Soo Line, who had known respondent since 1914; L. L. Smith, who had represented the Chicago, Indianapolis and Louisville, the Monon and the Grand Trunk railroad companies, and had known respondent for fifteen or sixteen years, and Joseph L. Earlywine, whose firm represented the Elgin, Joliet and Eastern Railway Company and other railroad companies, who had known respondent for twelve years, each of whom had had occasion during their acquaintance with respondent to come in contact with him many times with relation to claims which respondent's clients had against the railroad companies represented by the witnesses, testified that during all their dealings with him they always found him fair, just, frank and ethical, making full disclosure of his client's case, with the names of witnesses and their residences, with the privilege of communicating with the witnesses and verifying their reports, and that whenever the extent of the injury was in dispute he always permitted a physical examination of his client by the surgeons of the company, when requested. E. A. Vogel, a claim agent of the Chicago, Rock Island and Pacific Railroad Company having charge of the handling of personal injury cases in and around Chicago for that company, gave like testimony with reference to his experience. Where an attorney by his conduct has built up for himself a reputation for honesty and fair dealing, when his integrity as a lawyer is assailed such reputation is a circumstance strongly tending to prove his innocence.

When the evidence in this case is considered in the light of all the circumstances in evidence, taken in connection with respondent's past record for honesty and fair dealing in the handling of his cases, we are of the opinion that

relator has failed to prove respondent guilty of the charge contained in the first count of the information.

The second count of the information alleged that false and fraudulent affidavits, known to be so by respondent, were presented to the circuit court for the purpose of inducing the court to grant an order advancing said cause to trial ahead of its regular place on the calendar. On December 9, 1924, respondent made a motion in the circuit court to advance the case of Donahue against the railroad company out of its regular place on the calendar and for an early trial. In support of this motion two affidavits were presented to the court, one signed and purporting to be sworn to by the plaintiff in the suit, Donahue, and the other purporting to be signed and sworn to by respondent. In Donahue's affidavit he stated that on November 5, 1924, he was employed by the Chicago, Burlington and Quincy Railroad Company as a switchman in its railroad yards at Chicago; that while so employed on said date he was seriously injured and in consequence of the same was confined in the Mercy Hospital, in the city of Chicago; that he has been informed by his doctor that his back is broken and that he is permanently injured for life and is paralyzed and totally disabled from assisting himself; that at the time of the accident his only means of income and support were his daily wages; that he had no other means upon which to depend to support and maintain himself and family, which consisted of his wife and two small minor children totally dependent upon him; that he is in urgent need of medical care and attention on account of his physical, critical condition; that he has no money and friends to secure such help and that he has exhausted all means in trying to secure help from his friends and relatives; that he is now confined to his home in a helpless condition and unable to seek employment to maintain himself; that he has employed respondent as his attorney; that he has been informed by his attorney that he has a good, meritorious cause

of action against the railroad company and believes that he is entitled to an immediate trial of his lawsuit. Respondent in his affidavit said that he was the attorney for Donahue; that he had investigated the facts and the law in connection with the case and believed that Donahue has a good, meritorious cause of action against the railroad company, and that he believed that the facts set forth in Donahue's affidavit are true and that he is entitled to an immediate trial of the lawsuit, and asked that the cause be set down for trial at an early date. It is claimed by relator that respondent was guilty of misconduct in filing these affidavits, in that he knew that the facts stated therein were not true and that the affidavits were made for the fraudulent purpose of advancing the trial of the cause out of its regular order.

It is true that many of the statements contained in Donahue's affidavit were untrue and known to him to be untrue. As to respondent, however, the facts are entirely different. Respondent in his affidavit did not state that the facts alleged in Donahue's affidavit were true but only that he believed them to be true. It is claimed by relator that Donahue's statement that he was in urgent need of medical care and attention on account of his critical, physical condition and that he had no money and funds therefor and that he had exhausted all means in trying to secure help from his friends and relatives was untrue, and that respondent knew the same to be untrue for the reason that the McCallums had for some time been supporting Donahue and paying his expenses at a hotel in Chicago. It is true that Donahue's statement in regard to his need of medical care and attention and his lack of funds therefor was untrue for the reason that at that time he was in the employ of the railroad company and yet such fact was not known to respondent, and while respondent and his brother had advanced money to Donahue for his personal expenses and for assistance to his family yet they were under no obliga-

tion to do so. It is also claimed that respondent knew that Donahue was not confined to his home in a helpless condition. While respondent knew that Donahue had a family residing in Minnesota, yet prior to his supposed injury he had left his family there and taken a presumably permanent job with the railroad company, and for some time prior to the making of the affidavit he had been confined to his room in the Sherman House in an apparently helpless condition. While technically this room in the Sherman House may not have been Donahue's home, this is a mere technicality, as respondent knew that such room was then Donahue's present place of abode, that he was confined therein in an apparently helpless condition, and that he was apparently in urgent need of medical care and attention on account of his physical, critical condition. As we have seen, respondent at that time had no knowledge whatever that Donahue's condition was feigned, but, on the contrary, he had every reason to believe from the statements made to him by Donahue, taken in connection with his apparent physical condition, that he was in a helpless, and apparently critical, physical condition. Donahue's statements to respondent as to his physical condition were corroborated by written statements made to respondent by reputable physicians who claimed to have made a thorough physical examination of Donahue. There is no evidence showing or tending to show that at the time respondent made the affidavit in question he did not believe the facts therein stated as to Donahue's physical and financial condition. If those facts were true, then Donahue was entitled, under the rules of practice, to have his cause advanced for a speedy trial, and it was immaterial whether he was confined to his home or was confined under like conditions in a room in the Sherman House. The charge in the second count of the information is tantamount to a charge of perjury against respondent, and the evidence in the case falls far short of the degree of proof required to substantiate such charge.

The third count of the information charged that respondent was engaged in the practice of his profession in association with his brother, James A. McCallum, who is not a lawyer, and that the business of the office was conducted in such a manner as to bring about a division of fees for legal services by respondent with James A. McCallum and with other persons not admitted to practice law, and that respondent thus fraudulently enabled and permitted his brother to engage in the practice of law without a license from this court; that respondent employed solicitors and actively sought business by direct solicitation; that he contributed money to maintain his clients as a regular system, and advanced court costs and charges to his clients contrary to law and to the ethics of the profession of the law, and that in the solicitation of cases he sought to secure clients by representing, as an inducement to employ him, that he would liberally maintain the client during the pendency of the litigation. There is evidence in the case tending to show that prior to November 22, 1924, a relationship which in law would constitute a partnership existed between respondent and his brother, who is not a lawyer. On that date the grievance committee of the Chicago Bar Association, through its attorney, asked respondent to treat as a complaint against him a recent opinion of the Appellate Court. Respondent answered that communication in a lengthy letter under date of November 26, 1924, in which he stated the relationship existing between himself and his brother and that in his opinion there was nothing improper in such relationship, but stated, "I think I now understand the distinctions that the courts make, and whether the arrangement I had with my brother is proper or improper, I will see to it that in the future our arrangements are such that they cannot be criticised." The grievance committee passed upon the question after giving the matter careful consideration and abandoned its proceedings and no court action was taken by the bar association on that complaint

after respondent had made his answer thereto. Without going into the evidence in detail, we are of the opinion that it shows that since that time, while J. A. McCallum was connected with the office of respondent, his connection was that of employee and not of a partner.

The evidence shows that at various times the McCallums have advanced living expenses to needy clients who had claims for personal injuries against railroad companies where respondent had a fee contract, which was a lien upon any damages which might be recovered upon the injury. In most such cases the clients were unable to work, had no money or property, and their only asset was the claim for damages against the. railroad, upon which respondent had a lien. We know of no law which makes it more unethical, under such circumstances, to advance living and medical expenses to the client, and so prevent his becoming a public charge, than it would be, if the client's only asset were a piece of real estate, to advance him, on a mortgage thereon, money for such expense. It is not uncommon for attorneys to commence actions for poor people and make advances of money necessary to the prosecution of the suit upon the credit of the cause. Thus a man in indigent circumstances is enabled to obtain justice in a case where without such aid he would be unable to enforce a just claim. (*Christie* v. *Sawyer*, 44 N. H. 298; *Shapley* v. *Bellows*, 4 id. 355.) The practice of advancing money to the injured client with which to pay living expenses or hospital bills during the pendency of the case and while he is unable to earn anything may in a sense tend to foment litigation by preventing an unjust settlement from necessity, but we are aware of no authority holding that it is against public policy or of any sound reason why it should be so considered. (*Johnson* v. *Great Northern Railway Co.* 128 Minn. 365; *Potter* v. *Ajax Mining Co.* 22 Utah, 273.) By canon 42 of the ethics of the American Bar Association it is permissible for an attorney to advance costs and court

charges for his client, with the understanding that the same are to be ultimately paid by the client.

Much evidence was heard on the subject of solicitation of business. The railroad company, with the aid of two of respondent's employees whom it had corrupted, after the expenditure of much time and money in interviewing former clients of respondent, produced some who testified that their cases had been solicited by persons purporting to represent respondent, while respondent produced many of his former clients to testify to his fair dealing and that they had taken their cases to him by reason of his general reputation among the railroad men as to his success in personal injury cases. Railway Men's Union officials testified as to his reputation in that respect among the Railway Union men. Respondent testified that he had not personally solicited any claim. When the evidence is all considered we are of the opinion that it shows some solicitation on the part of persons purporting to represent respondent and that he had knowledge of such solicitation. The undisputed evidence in the case is that it was the general report that all personal injury lawyers in Chicago had solicitors out. The fact that other personal injury lawyers had solicitors for the purpose of procuring business for them, however, is no justification in this case. Its only relevancy is that it is one of the circumstances to be considered, together with all the other evidence in the case, as to respondent's motive and intention. It is a practice, however, which is contrary to the canons of ethics of the State and the American Bar Associations. The American and the State Bar Associations are not legislative tribunals, and their canons of ethics are not of binding obligation and are not enforced as such by the courts, although they constitute a safe guide for professional conduct in the cases to which they apply, and an attorney may be disciplined by this court for not observing them. (*Hunter* v. *Troup*, 315 Ill. 293.) This court has by way of dictum said that

all forms of advertising are not to be understood as forbidden or to be considered as unethical or unprofessional; that the canons of ethics of the American Bar Association recognize the publication and circulation, as a matter of convenience, of ordinary business cards stating the attorney's name, location, his specialty in the law, (if he has one not prohibited by law,) and making reference to responsible persons from whom his standing and responsibility may be learned by persons in need of such an attorney, or to advertising, to the extent indicated, in any publications that are circulated among lawyers and business men who may require the services of an attorney in a foreign city or State, or even in a local municipality, provided no improper contract is exacted of the patrons or the advertisement is unaccompanied by self-laudatory statements by the attorney or the newspaper editor or proprietor. The dividing line between advertisements of that character and advertisements by means of business cards circulated among men who are in urgent need of an attorney to safeguard their interests, by persons who are paid a fixed salary, not contingent upon their success in procuring clients, and where no fraud or misrepresentation is used, is exceedingly narrow. In each case the money expended by the attorney is for the object of bringing his name to the attention of persons in need of legal services.

The discretion of courts in disbarment proceedings is not to be exercised in an arbitrary manner, but in accordance with legal rules and principles, in determining the guilt of the party charged. As some infractions of the Criminal Code are more serious than others and call for a much higher grade of punishment, so it is with infractions of the canons of ethics. The offense of the solicitation of business charged against respondent is not one which imports, neither does the evidence produced in support thereof show, venality, criminality, fraudulent practices or moral turpitude on his part. We are of the opinion that while the

circumstances of this case are not such as call for the disbarment of respondent yet they cannot lightly be passed over. Conduct such as respondent's in soliciting business is deserving of severe censure by this court, and persistence therein would justify disbarment.

The motion of relator that the rule be made absolute is denied, and, with this censure, the rule is discharged.

*Rule discharged.*

Dunn, C. J., Stone and DeYoung, JJ., dissenting:

We disagree with the opinion of the court and dissent from its judgment. The commissioner found that the first count of the information, charging the respondent with knowingly prosecuting a fraudulent claim against the Chicago, Burlington and Quincy Railroad Company in the circuit court of Cook county for personal injuries, was not sustained by the evidence, and the majority of the court are of the same opinion. Without concurring in this conclusion and without comment upon this count we shall consider the other two, upon which, in our judgment, the record contains ample evidence to require the disbarment of the respondent.

The second count charged the respondent with presenting to the court affidavits which he knew to be false, for the purpose of inducing the court to advance the case for trial ahead of its regular order on the court calendar. The acts charged in this count and the circumstances under which they occurred are stated in the opinion of the court, and it· is said in the opinion that many of the statements in Donahue's affidavit were untrue and known to him to be untrue. It is further said, however, that with respect to the respondent the facts were entirely different, because, it is said, he did not state that the facts alleged in Donahue's affidavit were true but only that he believed them to be true. This affidavit was prepared by James A. McCallum from a form which William Wallace McCallum had in his office

for use in support of motions to advance causes for trial. On his way home from the office in the evening James A. McCallum took the affidavit so prepared to Donahue, who signed it, and on the former's return to the office the next morning he went to a notary public and had him sign the jurat. This affidavit in form, although not sworn to, was presented to the court as an affidavit, and the respondent, in the affidavit which he filed, swore that he believed the facts set forth in the instrument signed by Donahue were true. Eliminating for the present purpose the averments concerning the supposed accident and its results, Donahue's physical condition, the dependency of his wife and children upon him and the meritorious character of his cause of action, among the facts alleged in the instrument were, that he, Donahue, was in urgent need of medical care and attention on account of his critical physical condition; that he had no funds to secure such help; that he had exhausted all means to secure help from his friends and relatives, and that he was at the time confined to his home in a helpless condition. These statements were all material to the question whether the cause should be advanced for an early trial. They were false, and they were known by the respondent, as well as Donahue, to be false. Donahue was not in urgent need of medical care and attention, he had made no effort to secure help from his friends or relatives, and he was not, and had not been, confined to his home. He was living comfortably, if not luxuriously, in a well-appointed hotel and funds to meet all his requirements were advanced to him by the respondent and his brother, and the funds so advanced were to be refunded, with interest at five per cent, together with attorney's fees, out of the money to be recovered from the railroad company. While the respondent did not swear that the alleged facts in Donahue's affidavit were true, he did swear that he believed them to be true. Granting that he believed Donahue's statements in regard to the alleged accident and supposed resulting injury

and that he believed his cause of action to be meritorious, still he knew that the statements made for the purpose of inducing the allowance of the motion for an early trial were untrue. These statements were material to the determination of the motion, for without them there would have been no showing for its allowance. Through them the court was informed that a workman had been seriously injured by the negligence of the defendant; that he was totally disabled and confined to his home, with a wife and children dependent upon him; that he was without money or other source of income, and that he had exhausted all means to secure help from his friends and relatives. The affidavits were the only source of information which the court had on the subject, and in reliance upon the false statements they contained the motion was allowed and the cause was advanced for an early hearing. The purpose of these false representations was to deceive the court, for it could not reasonably be expected that any court, if informed of the real situation, would have given precedence to the trial of the cause. No principle of law is more elementary than that perfect candor to the court is the first duty of every attorney at law. Only after it has been made to appear by examination and investigation that an applicant for a license to practice law is honest and possesses a good moral character, as well as the requisite ability, education and knowledge, is the court justified in granting him such a license. By this license he becomes a member of the bar, he practices his profession by virtue of it, and he is subject to discipline and disbarment for conduct inconsistent with his duty to the court or to his client. Every attorney at law is an officer of the court and in every trial owes a duty to the court as well as to his client. Every trial of an issue of fact is an investigation to ascertain the truth of the matter. The court has a right to expect that the attorneys in a case will neither make false representations to nor endeavor to mislead the court. The views of the court with respect to the

second count we regard as inconsistent with the facts in the case and the law concerning the relation of an attorney at law to the court. The false averment of Donahue's need of medical care and attention and his lack of funds therefor is passed over with the statement that while the respondent and his brother had advanced money to Donahue for his personal expenses and for assistance to his family, yet they were under no obligation to do so. If the facts had been stated in the affidavit it would have appeared that Donahue was in no need of medical care and attention or of money because these had already been provided for by the respondent and his brother. Moreover, we do not agree with the statement in the opinion that "while technically this room in the Sherman House may not have been Donahue's home, this is a mere technicality." In our opinion the characterization of the substantial difference between the two places as a mere technicality will not suffice, for the false statement was inserted in the affidavit with the specific intention of deceiving the court into believing that Donahue was confined to his home with his wife and two children in dire want, and that he was penniless, without credit and without friends or relatives to whom he could appeal for help, when, in fact, ample provision had been made for his comfortable support in a well known hotel.

The Canons of Professional Ethics adopted by the American Bar Association, the Illinois State Bar Association and the bar associations of most, if not all, of the States, provide that "the conduct of the lawyer before the court and with other lawyers should be characterized by candor and fairness. * * * It is unprofessional and dishonorable to deal other than candidly with the facts in taking the statements of witnesses, in drawing affidavits and other documents and in the presentation of causes. * * * These and all kindred practices are unprofessional and unworthy of an officer of the law charged, as is the lawyer, with the duty of aiding in the administration of justice." While

these canons have been voluntarily adopted by the bar associations and have not the obligation of a statute, yet they indicate the standard of professional conduct which these organizations regard as proper for the guidance of their members. We have adopted that standard as a safe guide for professional conduct in the cases to which the canons apply and have said that an attorney may be disciplined by the court for not observing them. (*Ringen* v. *Ranes,* 263 Ill. 11; *People* v. *Berezniak,* 292 id. 305; *Hunter* v. *Troup,* 315 id. 293.) In our judgment the conduct of the respondent in presenting the affidavits was intended to deceive, and did deceive, the court and necessarily influenced the decision upon the motion. His conduct was a violation of the canon quoted and was unethical and unprofessional. The case of *People* v. *Barrios,* 237 Ill. 527, is authority for making the rule absolute on the evidence adduced in support of the second count of the information.

The third count is sufficiently set out in the court's opinion, and the charges to which we shall particularly address ourselves are, that the respondent was engaged in the practice of his profession in association and partnership with his brother, James A. McCallum, who was not a lawyer, and divided fees with him, and that they hired solicitors for the purpose of securing clients to employ the respondent as their attorney. In our judgment neither argument nor authority is necessary to show that either of these charges, if sustained by the evidence, requires the disbarment of the respondent. Section 1 of the act in relation to attorneys and counselors declares it to be a misdemeanor punishable by fine or imprisonment, or both, for any person to practice law in this State without having previously obtained a license for that purpose. Any licensed lawyer practicing law in association and partnership with a person not licensed to practice is an accessory to the misdemeanor of the latter, and such an association or partnership can be nothing but an attempt to evade the statute.

Section 27 of the Canons of Professional Ethics already mentioned declares that "solicitation of business by circulars or advertisements, or by personal communications or interviews, not warranted by personal relations, is unprofessional." In the opinion of the court it is said in relation to these charges that there was evidence tending to show that prior to November 22, 1924, a relation existed between the respondent and his brother which in law would constitute a partnership, but it is further said that "without going into the evidence in detail, we are of the opinion that it shows that since that time, while J. A. McCallum was connected with the office of respondent, his connection was that of employee and not of a partner." In our view of the evidence it not only tended to show, but clearly established, that before November 22, 1924, the respondent and his brother were partners, and that no substantial practical change was made in the conduct of the business after the Appellate Court for the First District, in *Puls* v. *Chicago and Northwestern Railroad Co.* 233 Ill. App. 625, affirmed the judgment of the circuit court of Cook county on the appeal of the respondent from an order dismissing his intervening petition for an attorney's lien. Instead of being an employee of his brother, James was, after as well as before November 22, 1924, the manager of the business and finances of the partnership; he solicited and secured cases, and directed to a greater extent than the respondent how they should be conducted; he furnished money to support their indigent clients and shared in the profits of the firm. The commissioner found that "the respondent and James A. McCallum were engaged in the practice of the profession of law together in the nature of a law partnership or firm and that they shared the emoluments of such law practice, although said James A. McCallum was not by education, training or experience fitted to be a lawyer, nor was he admitted to practice." Our conclusion from the evidence is in accord with this finding of the commissioner. By the

authority of *People* v. *Berezniak, supra,* the evidence justifies making the rule absolute, upon the third count.

The charge was made by counsel for the respondent on the hearing before the commissioner, and is often repeated in varied form in their briefs and petitions for rehearing, that the railroad company is the real prosecutor of the present information and that the company is not clean-handed; that the proceeding was instigated and is carried on by the railroad company masked and cloaked as the Chicago Bar Association, and that the prosecution of the information is unfair, vindictive and not in good faith and is conducted to serve the private motives of the grievance committee of the relator. In *People* v. *Holt,* 279 Ill. 107, the respondent objected that the making of the charges and the proceeding for disbarment were inspired by political animosity and personal malice, but the court said: "If it were true that the charges would not have been made except for personal hostility, it would neither relieve the court from the duty of investigating the charges nor the respondent from disbarment if they were found to be true." The issues presented by the several counts of the information must be determined from the evidence in the case. There is nothing in the record which justifies the charge of personal hostility or the want of good faith on the part of the relator in prosecuting the information against the respondent. The evidence discloses, on the contrary, that the motive which actuated the representatives of the relator in filing and prosecuting the information was to maintain a proper standard of conduct in the practice of law. The relator sought to perform a duty inherently disagreeable, as in all cases of this character, under an abiding appreciation of its obligation to the profession.

In our opinion the judgment of the court should make the rule absolute.