Per Curiam.

This proceeding was set in motion in 1962 when the Mahoning County Bar Association filed its written complaint with the Board of Commissioners on Grievances and Discipline, charging John Buffalo, Jr., an attorney at law of the city of Youngstown admitted to the Bar of Ohio in 1946, with unprofessional and unethical conduct in violation of the Canons of Professional Ethics.
The complaint, consisting of 14 charges, was referred to a three-member hearing panel for the taking of evidence and for report. Upon hearing, the panel concluded that charges numbered 3, 8, 9, 10, 11, 12 and 13 had been proved, and that respondent had violated Canons 10, 27, 29 and 32 of the Canons of Professional Ethics. Based on the findings and conclusions of the panel and the record, the board recommended that respondent be disbarred.
As stated in paragraph five of the syllabus in In re Lieberman (1955), 163 Ohio St., 35, 125 N. E. (2d), 328, “the degree of proof required in a disbarment proceeding is a preponderance of the evidence.” To the same effect see the per curiam opinion in Cleveland Bar Association v. Fleck (1961), 172 Ohio St., 467, 469, 178 N. E. (2d), 782.
In cases of this kind, the board of commissioners acts for and on behalf of this court. In doing so, it makes recommendations as to the facts which should be found and the action which *264 should be taken by this court. However, this court has full responsibility for determining what the facts are and what action should be taken on those facts.
As to charge No. 8, it is stated in respondent’s brief:
“The facts * * * which are alleged in this charge are that respondent ‘did advance monies to certain clients * * * while their claims were pending, which advances were deducted from any settlements * * * later received in settlement of said claims.’ Those facts do not * * * constitute misconduct * * *.
( i * # #
“The record shows that respondent did advance monies to certain clients, but with the understanding that such monies were to be repaid irrespective of the outcome of the pending litigation. * * #
“A loan is not a purchase. So long as there is an agreement that the money is a debt and is to be repaid irrespective of the outcome of the case, it is nonsense to claim that the loan or advance amounts to the purchase of an interest in the litigation. Indeed, a contingent fee contract with an assignment to the lawyer (the recovery of which is wholly dependent upon the outcome) comes much closer to the prohibition in this canon [No. 10] than the simple loan or advancement of money. Yet such a fee contract is perfectly valid in the state of Ohio and has been upheld by the courts of Ohio in litigation involving-lawyers’ claims based upon such contracts. Roberts v. Montgomery, 115 Ohio St., 502, Scheinesohn v. Lemonek, 84 Ohio St., 424, and Cleveland Ry. Co. v. Godfrey, 28 O. L. R., 466 * * *." But cf. Canon 13.
Canon 10 provides:
“The lawyer should not purchase any interest in the subject matter of the litigation which he is conducting.”
Canon 42 reads:
“A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience but subject to reimbursement.”
It is clear that the word “expenses” appearing after the semicolon refers to “expenses of litigation.” It would not include advances of the kind admittedly made by respondent for *265 “living expenses * * * during the period between the filing of and the trial or disposal of the ease.” See opinion No. 288 of the Legal Ethics Committee of the American Bar Association, 41 A. B. A. Journal, 33, issue of January 1955. We cannot reconcile the majority opinion in People, ex rel. Chicago Bar Association, v. McCallum (1930), 341 Ill., 578, 173 N. E., 827, on this question with Canons 10 and 42.
It is obvious that, where the advancement of living expenses is made, as in the instant case, to enable a disabled client and his family to survive, any agreement by the disabled client to repay them would not have the effect of providing the attorney with any reasonable source of repayment other than the proceeds received on trial or settlement of his client’s claim. In effect, the attorney has purchased an interest in the subject matter of the litigation that Ke~is conducting. The canons contemplate that this will be proper only where the advance is for “expenses of litigation.”
It may be observed that the cases of Roberts v. Montgomery, supra (115 Ohio St., 502), Scheinesohn v. Lemonek, supra (84 Ohio St., 424), Cleveland Ry. Co. v. Godfrey, supra (28 O. L. R., 466), and Reece v. Kyle (1892), 49 Ohio St., 475, were all decided before this court adopted by rule the Canons of Professional Ethics. In view of the adoption of those canons, those cases would no longer be applicable to the extent that they are inconsistent with provisions of the canons.
As to charge No. 13, the report of the board summarizes the evidence and facts as follows:
“It is charged that the respondent conspired with * * * Orlando and paid Orlando money for preparing lawsuits against the Baltimore & Ohio Railroad which was Orlando’s employer.
“The evidence in support of this charge is not in dispute. Orlando worked as an investgator for the respondent from 1953 to July 19, 1962. During this same period he was also an employee of the Baltimore & Ohio Railroad. He was suspended by the railroad on July 21, 1962, on charges of soliciting claims. A hearing was held on these charges but Orlando did not appear because he says he was in the New Castle Hospital. During his employment with the respondent, Orlando was paid $25 a day plus expenses and investigated all of the respondent’s railroad *266 cases. He said that he worked an average of ten or fifteen days a month for the respondent. Withholding slips, internal revenue form 1099, were received in evidence * * * and showed the following amounts paid to Orlando by the respondent:
“1957 — $2,950.00
“1958 — 1,250.00
“1959 — 1,237.37
“1960 — 3,829.25
“1961 — 4,716.00
“According to Orlando, respondent paid him in cash for which Orlando said he signed receipts. Orlando said that the respondent kept no records, but paid Orlando on the basis of Orlando’s records, but didn’t keep these records after his income tax returns were filed * * *. Respondent stated:
“ ‘We worked on that basis for the particular reason that we didn’t want this man to be accused of exactly what he was accused of, which he wasn’t doing and which he did not do, but the fact was that I was trying to protect him. He was trying to help me as an investigator. He had certain knowledge, certain abilities that I needed, and I was trying to protect him, and that was the reason that we worked this thing out this way. With any other person that has ever done any work for me * * * I have paid him by check, but particularly for security reasons for this man, that was the reason we worked it this way. ’
“Later respondent testified that he had no record of payments made to Orlando on his books. He also testified that—
“ i* * * ag goon ag £pey were examined by the Internal Revenue Department, why, we got rid of them, because we didn’t want to keep them, because of the fact we didn’t want to involve Mike — ’ * * *.
‘ ‘ The respondent was ordered by a subpoena issued by the board * * * to produce ‘ all your records, checks, disbursements and receipts of any kind or nature showing payments to Michael Orlando * * * for the years 1957, 1958, 1959,1960,1961 and 1962. ’ Respondent only produced the withholding slips * * *. Respondent was also requested by the chairman of the panel to produce all of his records so that counsel for the relator could determine for themselves whether or not *267 Ms records contained any entries which would reflect on the payments made by respondent to Orlando * * *. The respondent did not produce his records and refused to comply with the request of the chairman of the panel * * *.
“Although the full extent of Orlando’s activities in behalf of the respondent could perhaps be better determined if respondent had submitted his records for examination as requested by the chairman of the panel, there is no dispute about the fact that the respondent did employ Orlando to investigate cases against the Baltimore & Ohio Railroad while Orlando was working for that railroad * * *. Furthermore, the respondent admits that he kept no entries of payments to Orlando so that he would have no record which would disclose the fact that Orlando was employed by the respondent. The panel questioned the respondent at length * * * on his views relating' to the practice of employing Orlando to investigate cases against the Baltimore & Ohio, while he was employed by the company. He saw nothing wrong with the practice because'he was ‘doing something altogether different from the type of work he was doing on the railroad’ * * *. But he admitted employing Orlando because of the advantages in having a railroad man working for him * * *. He saw no distinction between employing any railroad employee and one who was investigating claims against his own employer, because ‘our concepts have changed * * ”
With respect to this summarization, respondent’s brief in this court states :
“As stated by the board, there is no dispute in the evidence with respect to the foregoing charge. The board does indulge in some innuendos, but the facts relevant to this charge are, simply stated, these: Respondent did hire Michael Orlando to investigate lawsuits for him, and some of those lawsuits involved claims against the Baltimore & Ohio Railroad Company. During this time * * * Orlando was an employee of the Baltimore & Ohio Railroad Company, but engaged in train service, that is, the service of a working railroad brakeman. While we do not consider it material, respondent did frankly testify that he kept no entries of payments to Orlando and that payments were made in cash.”
*268 Eespondent contends that his employment of Orlando to work against the interests of Orlando’s employer, B. & 0., was proper by reason of the provisions of Section 60, Title 45, U. S. Code, which reads in part:
“Any contract, rule, regulation, or device whatsoever * * * to prevent employees of any common carrier from furnishing voluntarily information * * * as to the facts incident to the injury or death of any employee, shall be void, and whoever * * * shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction * * * be punished * * (Emphasis added.)
Obviously this statute would have no application to the instant case. Orlando did not “voluntarily” furnish information. He was paid by defendant to get information.
Eespondent’s employment of Orlando to work against the interests of his employer, B. & 0., so as to benefit respondent and his clients was not an isolated instance. What records respondent was able to produce indicated substantial payments to Orlando in each of five years.
The payment of $4,716 in 1961 was all for work done prior to July 19 of that year.
Eespondent now argues that there was nothing wrong with respondent’s paying Orlando substantial sums of money to work against the interests of his employer, B. & 0., so as to benefit respondent and his clients.
If the respondent did not know that it was wrong to do this, why did he try to cover it up? His testimony that he did this to protect Orlando from charges being made by B. & 0. is not convincing testimony that he did not know that this employment of Orlando was wrong.
Why did respondent not produce records to show what the payments were for? The evasive attempts of both Buffalo and Orlando to explain their lack of records on the basis that they were no longer needed to sustain their income tax returns arouses a strong suspicion that those records contained information which would have been damaging to both Buffalo and *269 Orlando. Their 1961 income tax returns could not have been filed before January 1962 and were not due until April 1962. In July 1962, B. & 0. charged Orlando with soliciting cases against it for Ruff alo. In September 1962, Buffalo was charged with employing Orlando to solicit cases for him. Buffalo undoubtedly knew that such charges were being prepared and investigated long before that time. It is difficult to believe that the 1961 federal income tax returns of either Orlando or Buffalo had been checked by the Internal Revenue Service before July or even September 1962. At that time, they definitely knew that any records showing either of them to be innocent of charges of soliciting would be helpful to both. It is almost impossible to reach any reasonable conclusion that the records of either, at least for 1961, were not destroyed in order to prevent their use against Orlando in the proceedings brought against him by B. & 0. and against Buffalo in the proceedings brought against him.
In our opinion, one who believes that it is proper to employ and pay another to work against the interests of his regular employer is not qualified to be a member of the Ohio Bar. He is even less qualified if he does so, when he knows, as the evidence clearly indicates Buffalo did know, that it is improper to do so.
This is not the first time that respondent’s conduct as a member of the bar has been questioned and found improper. After he was found “guilty of unprofessional conduct in his office as an attorney at law * * * in that he did by and through duly authorized agents and employees solicit professional employment from sundry people” and was disciplined therefor in 1957, he showed a contempt for the court, which made that finding and provided a very lenient discipline for his misconduct. Although he admittedly was well able to pay the costs amounting to several hundreds of dollars and had been ordered by that court to “pay the costs of this proceeding within 30 days,” he neglected to make any effort to pay them until shortly before the first hearings in these proceedings more than five years later.
The members of this court are not in agreement as to whether the facts are as the board of commissioners recom *270 mended they should be found with respect to some of the other charges against respondent. However, in view of the admitted facts with regard to charges 8 and 13 and the previous judgment of 1957 and the attitude of respondent with respect thereto, we are of the opinion that respondent should be suspended for an indefinite period from the practice of law.

Judgment accordingly.

Taft, C. J., Zimmerman, Matthias, O’Neill and Kerns, JJ., concur.
Gibson, J., concurs in the judgment.
Herbert, J., dissents.
Kerns, J., of the Second Appellate District, sitting by designation in the place and stead of Griffith, J.