(174 App. Div. 94)

### In re NEWELL.

(Supreme Court, Appellate Division, Fourth Department.  July 6, 1916.)

1. CHAMPERTY AND MAINTENANCE ☞5(3)—BUYING DEMANDS ON WHICH TO BRING ACTION—STATUTE.

Written retainers of an attorney in negligence cases, procured by his agent, an "ambulance chaser," providing that he should charge the client nothing unless successful in collecting damages, and providing that, in consideration thereof, the client agreed to pay the attorney a certain per cent. of damages received, in addition to his costs, as compensation for his services and disbursements, and that in case of settlement, where there would be no costs or taxable disbursements, the same per cent.

should be paid as compensation for the attorney's services and disbursements violated Penal Law (Consol. Laws, c. 40) § 274, subd. 2, prohibiting the buying of demands on which to bring an action.

[Ed. Note.—For other cases, see Champerty and Maintenance, Cent. Dig. §§ 26, 27; Dec. Dig. ☞5(3); Attorney and Client, Cent. Dig. § 247.]

2. ATTORNEY AND CLIENT ☞38—DISCIPLINING ATTORNEY—CRIME.

It is not necessary for an attorney to be guilty of crime in order to subject himself to the discipline of the court.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51, 61; Dec. Dig. ☞38.]

3. ATTORNEY AND CLIENT ☞38—PROFESSIONAL MISCONDUCT—EMPLOYMENT OF AMBULANCE CHASER.

Irrespective of any statute, an attorney who employed an "ambulance chaser" was guilty of professional misconduct, and of conduct prejudicial to the administration of justice.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51, 61; Dec. Dig. ☞38.]

4. ATTORNEY AND CLIENT ☞38—UNPROFESSIONAL CONDUCT—CORRUPTING EMPLOYÉ OF RAILROAD.

An attorney, specializing in negligence cases, who had an arrangement with an employé of a railroad whereby the later disclosed telegraphic communications received by the road containing the particulars of accidents occurring in its operation, so that the attorney might have his "ambulance chaser" at the place of the accident at the earliest possible moment, was guilty of vicious and unprofessional conduct.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51, 61; Dec. Dig. ☞38.]

5. ATTORNEY AND CLIENT ☞34—SUSPENSION OR REMOVAL—STATUTE.

Judiciary Law (Consol. Laws, c. 30) §§ 88, 476, 477, provide for the suspension or removal of an attorney from practice.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 47; Dec. Dig. ☞34.]

Disbarment proceedings against James E. Newell, an attorney. Application on report of referee upon charges against respondent for professional misconduct. Report of referee confirmed, and order of disbarment entered.

Argued before KRUSE, P. J., and FOOTE, LAMBERT, MERRELL, and DE ANGELIS, JJ.

Albert H. Clark, Dist. Atty., of Auburn, for petitioner.

William Nottingham and Ernest I. Edgcomb, both of Syracuse, for respondent.

PER CURIAM. The petition herein verified February 24, 1915, was filed March 17, 1915, and the answer thereto was filed on the same day. The matter was referred to Hon. Charles A. Hawley, a counselor of this court, to take the proofs and return the same to this court together with his opinion thereon, by an order entered March 17, 1915. In this order Albert H. Clark, the district attorney of Cayuga county, was designated to prosecute the charges against the respondent. The referee's report, dated January 15, 1916, was filed with the clerk of this court January 18, 1916. There accompanied the report, and were also filed, the minutes of the evidence taken by the referee and the exhibits.

The respondent was admitted to the bar of this state in 1889, and ever since has practiced his profession in the city of Syracuse. He has had a large practice, especially in negligence cases. Joseph Michels, the petitioner, resides in the city of Syracuse. He is not and never was an attorney at law. His principal occupation for many years has been the soliciting of retainers for different attorneys in Syracuse, chiefly in negligence cases, looking up evidence, and, after obtaining retainers, rendering assistance in preparing such cases for trial or settlement. For the period of about six years he had been employed by the respondent in that service, and when he left that employment he served other attorneys. He was again employed by the respondent in the summer of 1912, and continued in such employment until about the month of July, 1914. This service was under a written contract dated August 12, 1912, a copy of which appears in the evidence. By its terms this agreement was to continue for the period of five years from its date.

The respondent was a member of the firm of Newell, Chapman & Newell, of Syracuse, N. Y. The petitioner was furnished by the respondent with printed forms of agreement of retainer in negligence cases, copies of which are in evidence. Michels obtained a considerable number of negligence cases for the respondent and his firm, from which both Michels and the respondent and his firm received large sums of money. Upon ample evidence to sustain his finding, the learned referee finds that the transactions of the respondent with Michels under his written agreement, and in the use of the retainers procured by Michels, constituted violations of subdivision 2 of section 274 of the Penal Law (formerly section 74 of the Code of Civil Procedure), and such violations were many in number.

[1] We adopt the language of the learned referee, where he discusses the use of the agreements of retainer above referred to, to wit:

"It appears that the practice of obtaining these retainers by Michels was about as follows: Learning of an accident, from which a negligence action might probably arise, through the newspapers, or from any other source, Michels, either at the request of the respondent, or upon his own motion, would promptly proceed to the place of the accident, interview the person injured, or in case where death had ensued, the members of his family, present to them his view of the case, recommend the retaining of the respondent's law firm, and, if successful in his endeavor to obtain a retainer, would cause one of these printed blanks to be filled out, signed in duplicate, and one of the duplicates delivered to him, which he returned to the respondent. In some cases the retainers produced by the respondent and placed in evidence (there are 14 or 15 of them) were signed by the proposed plaintiff and by Newell, Chapman & Newell. In some cases the retainers produced appear to be signed by the proposed plaintiff alone, but the evidence justifies the inference that in such cases another copy, signed by Newell, Chapman & Newell, was delivered to and left with the plaintiff. These retainers, which are in evidence, were produced upon the trial, in most instances, at least, by the respondent.

"The prosecution contends that the respondent violated the statute in the use of these retainers as contracts between himself and his clients and that the terms of the retainers are contrary to law. * * * I am of the opinion that this contention is correct. The retainer provides that the attorneys are to charge the client 'nothing unless successful in collecting damages.' It provides that in consideration thereof the client agrees to pay the attorneys a certain per cent. of damages received in addition to their costs as compensation for their services and disbursements. The word 'disbursements,' I think,

means expenses, and not taxable disbursements; which are included in the word 'costs,' and this construction is made necessary I think, because the retainer provides that in case of a settlement, where there would be no costs or taxable disbursements, the same percentage should be paid as compensation for the attorneys' services and disbursements.

"The prosecution cites a considerable number of authorities to sustain its contention. It has been held that an agreement by an attorney to render services and also to advance money needed to carry on the suit was an agreement to advance money to the plaintiff, and violated the statute. Coughlin v. New York Central, 71 N. Y. 443, 27 Am. Rep. 75. So, too, it has been held (In re Speranza, 186 N. Y. 280, 78 N. E. 1070) that where an attorney makes a written proposition, by which he agrees to pay all court fees, fees of witnesses, and necessary disbursements to judgment, if the appellant would agree to the scale of compensation set forth in another writing, it would be a violation of section 74 of the Code of Civil Procedure."

[2, 3] Again we adopt the language of the learned referee:

"The Court of Appeals (Matter of Clark, 184 N. Y. 233, 77 N. E. 1) has adopted a popular name for one who solicits negligence cases for an attorney, which authorizes me to say that a man following that occupation may properly be called an 'ambulance chaser.' The courts have said that 'ambulance chasing' 'has brought deserved discredit upon those engaged in it'; that it is a practice 'disgraceful for a member of the legal profession,' * * * 'that has been commented upon at meetings of lawyers and in judicial decisions as well as by the general public'; * * * that it is 'also a practice which is unprofessional, and destructive of the honor of the profession and of the confidence of the community in the integrity and honor of its members.' Matter of Shay, 133 App. Div. 555, 118 N. Y. Supp. 146.

"While this case has been under consideration and during the writing of this report there have been published more than a score of decisions in disbarment cases recently made by the Appellate Division of the First Department. Matter of Cohen, 169 App. Div. 492, 155 N. Y. Supp. 459; Id., 169 App. Div. 548, 155 N. Y. Supp. 517; Matter of Forrester, 169 App. Div. 619, 155 N. Y. Supp. 420; Matter of Hawes, 169 App. Div. 644, 156 N. Y. Supp. 283. These decisions, and a greater number which have preceded them, show beyond all question that it is not necessary for an attorney to be guilty of a crime in order to subject himself to the discipline of the court. Many of the decisions are expressly based upon what is denominated 'professional misconduct.'

"It is not unjust to say that Michels, after his nearly 20 years' experience, may properly be called a professional 'ambulance chaser,' and that the respondent, at the time of the execution of the contract of August 12, 1912, well knew the fact; and I think the inference cannot be avoided that Michels' capabilities in that line of activity were a prominent feature in the desirability of his employment by the respondent. After his employment he used his capabilities as an 'ambulance chaser' for the benefit of the respondent in numerous cases, and this was done in part by the use of retainers which have already been considered. I think it necessarily follows that the respondent, when he employed such services, which are held to be discreditable, disgraceful, unprofessional, and destructive of the honor of the profession, was, irrespective of any statute, guilty of professional misconduct and of conduct prejudicial to the administration of justice."

[4] The learned referee finds, and the finding is amply sustained by the evidence, that from the spring of 1912 down to December, 1913, the respondent had an arrangement with an employé of the New York Central Railroad Company in the city of Syracuse, whereby this employé was to disclose and did disclose to the respondent telegraphic communications received in the administration of the affairs of the railroad company in the office where this employé was occupied con-

taining the particulars of accidents which occurred in the operation of the railroad, to the end that the respondent might have Michels at the place of the accidents at the earliest possible moment to obtain cases against the railroad company. This was a secret arrangement, and so vicious and unprofessional as to need no further comment.

The most serious charge against the respondent, involved in what is known as the Corbett Case, the referee refuses to sustain. We think the evidence would have justified a finding sustaining that charge, but do not feel that we should make a finding regarding that charge, in view of the conclusion reached by the referee.

We think there never was a time in the history of the profession of the law when conduct such as that of the respondent was tolerable from any point of view. As a member of his profession, the respondent needed not the reminder so forcibly expressed in the Matter of Shay, 133 App. Div. 547, 555, 118 N. Y. Supp. 146. But that admonition existed as long ago as 1909, three years before the respondent entered into the contract of August 12, 1912. Unless the members of our profession are prepared to abandon the traditions which have entitled it to be regarded as an honorable calling, unless we are prepared to yield to the notion that the members of our profession have our sanction to prey upon society, we should not hesitate to condemn the practices proven against the respondent in this case.

[5] Sections 88, 476, and 477 of the Judiciary Law (Consol. Laws, c. 30), taking the place of former sections 67 and 68 of the Code of Civil Procedure, provide for dealing with a matter of this kind. The able counsel for the respondent, who represented him on the hearing before the referee and in this court, have urged us earnestly to pursue a more lenient course; but our conception of the gravity of the respondent's offending and our duty in the premises, after careful consideration and with a feeling of sorrow, requires that we should revoke the license issued to the respondent to practice as an attorney and counselor in the courts of record of the state of New York and strike his name from the roll. It follows that the report of the referee should be confirmed, and the usual order of disbarment granted. Ordered accordingly.

Report of referee confirmed, and order of disbarment entered. All concur.