**In the Matter of John RUFFALO, Jr.**

**No. C 64–366.**

United States District Court
N. D. Ohio, E. D.

Oct. 4, 1965.

Charles Alan Wright, Cambridge, Mass., Craig Spangenberg and Donald Traci, of Spangenberg, Hasenflue, Shibley & Traci, Cleveland, Ohio, for John Ruffalo, Jr.

Mahoning County Bar Ass'n appeared amicus curiae.

BATTISTI, District Judge:

On May 20, 1964, the Supreme Court of Ohio ordered that Respondent John Ruffalo, Jr., be indefinitely suspended from the practice of law in Ohio. Ma-

honing County Bar Association v. Ruffalo, 176 Ohio St. 263, 199 N.E.2d 396 (1964). This order became final and effective when, on December 7, 1964, the Supreme Court of the United States denied Respondent's petition for certiorari. Ruffalo v. Mahoning County Bar Association, 379 U.S. 931, 85 S.Ct. 328, 13 L.Ed.2d 342 (1964).

Rule 1(E) of this Court's rules provides in part as follows:

"E. Disbarment and Discipline. Any member of the bar of this court may for good cause shown and after an opportunity has been given him to be heard, be disbarred, suspended from practice for a definite time, reprimanded, or subjected to such other discipline as the court may deem proper.

"Whenever it is made to appear to the court that any member of its bar has been disbarred or suspended from practice or convicted of a felony in any other court he shall be suspended forthwith from practice before this court and, unless upon notice mailed to him at his last known place of residence he shows good cause to the contrary within ten days, there shall be entered an order of disbarment, or of suspension, for such time as the court shall fix.

" *  *  * "

Pursuant to Rule 1(E) it was ordered on January 26, 1965, that Respondent suspend his practice in this Court. It was further ordered that Respondent show cause within 30 days why he should not be disbarred from practice in this Court.

On February 25, 1965, Respondent filed his response to the Order to Show Cause. Shortly thereafter the Court requested that the trustees of the Mahoning County Bar Association appear before the Court to discuss the matter of the disbarment proceedings. Since the Mahoning County Bar Association had aggressively prosecuted the State disbarment proceedings and was obviously the body most familiar with the facts of the case, it was the Court's feeling that said association should represent the interests of the Bar in these proceedings. A substantial number of the trustees of the Mahoning County Bar Association appeared in response to the Court's request for a meeting. At the meeting doubt was expressed as to whether the Mahoning County Bar Association wished to continue its participation in the matter. Rather, it was suggested that the Mahoning Bar would like to inquire whether the Ohio State Bar Association would appear in the proceedings in this Court.[1]

By order of the Court, a pretrial conference was set for March 26, 1965, to consider questions concerning procedure, stipulations, a hearing date, and any other matters which might be brought to the attention of the Court. The Mahoning County Bar Association was represented at this pretrial conference by Attorneys Joseph Bryan, James Bennett, Jr., and Paul Smith. The Clerk's minutes of the pretrial hearing show that the Mahoning County Bar Association orally moved to appear *amicus curiae* in these proceedings and that said motion was granted by the Court. The Clerk's minutes further show that the following schedule was set for the disposition of these proceedings:

(1) Counsel for the Respondent to file a proposed stipulation of facts by April 2, 1965.

(2) The Mahoning County Bar Association to file a statement of its views with regard to the proposed stipulation of facts by April 9, 1965.

(3) The Mahoning County Bar Association to file a brief in opposition to Respondent's re-

---

1. On motion by the Respondent, the Court, on March 10, 1965, modified the Order of January 26, 1965, to allow the Respondent to engage in the office practice of law during the pendency of these proceedings.

sponse to the Order to Show Cause by April 16, 1965.

(4) A hearing was set for April 26, 1965.

The Court was informed at this time that Attorney Joseph Bryan would be representing the Bar Association.

On April 3, 1965, Respondent filed his proposed stipulation of facts. On April 9, 1965, the Mahoning County Bar Association filed its objections 'to Respondent's proposed stipulation. On April 16, 1965, the Mahoning County Bar Association filed its brief in opposition to the Respondent's response to the Order to Show Cause.

Several days prior to April 26, 1965, the Court requested that the parties be contacted to confirm the oral hearing set for April 26. The Court learned in this manner that Attorney Joseph Bryan had withdrawn from the case. Thereafter, upon further inquiry, the Court learned through Attorney Oscar Kaufman, President of the Mahoning County Bar Association, that the Bar Association would appear at the hearing on April 26, 1965, but that it did not wish to offer any arguments.

On April 26, 1965, Attorney Craig Spangenberg appeared before the Court representing the Respondent. Attorneys Oscar Kaufman, Bernard Wilkes, and Charles P. Henderson appeared on behalf of the Mahoning County Bar Association. At the conclusion of Mr. Spangenberg's arguments, the following colloquy took place between the Court and the representatives of the Bar Association:

"COURT: Does the Mahoning County Bar, through its President, Mr. Kaufman, wish to argue?

MR. KAUFMAN: As President of the Mahoning County Bar Association, I have been directed by its trustees to say to the Court, in substance, that the Mahoning County Bar Association will waive arguments at this time, and will submit this cause to His Honor based upon the briefs filed in the record.

COURT: Now, after this record is typed, I would like an opportunity to review it, together with the briefs that have been filed thus far, for some questions that I wish to be argued before me; and at that time, if I do, the representatives of the Mahoning County Bar Association who have appeared, will be ordered to argue those questions. There are some very serious matters here, which I think need a thorough adverse argument. * * *

MR. WILKES: If the Court please, I think it should be made clear that no one of the Mahoning County Bar Association has read the record of the proceedings before the Ohio Supreme Court. We are not at all familiar with the contents of that record.

COURT: All right, you have made it clear on the record. I think it should be made clear on the record that the Mahoning County Bar Association has had time to read it, but perhaps not you—those sitting here at the counsel table. There was counsel who represented the Mahoning County Bar Association in this matter before this court, and in the case against Mr. Ruffalo before the trial board, and before the Supreme Court of Ohio and the Supreme Court of the United States, but he is not present here. He was on vacation at the time of the first conference. I think he has since returned.

MR. KAUFMAN: I regret I am not able to help to analyze that situation.

COURT: I cast no doubt against that particular attorney. I just want the record to show that he is not here and has not carried forward this argument.

I will begin immediately to work on this case, and the reporter will get it to me as quickly as possible. I do want you to be prepared for additional argument before the matter is completed in this court."

It is readily apparent from the above-quoted comments that the Court was, at the time of the hearing, less than satisfied with the conduct of the Mahoning County Bar in these proceedings. Further, the Court was of the opinion that the Mahoning County Bar Association, acting through its trustees, had failed to responsibly execute its duty to the Court and the Bar. Thus, notwithstanding the fact that the Mahoning County Bar Association aggressively prosecuted the State disbarment proceedings, at no time in these proceedings had any member appeared on behalf of the Association who appeared to have more than a fleeting knowledge of the facts of the case.[2] Under the circumstances of this case, as will be discussed in greater detail subsequently, the aid of the members of the Bar Association who had knowledge of the facts of the case would have been of invaluable assistance to the Court in the disposition of these proceedings.

Notwithstanding the Bar Association's clearly demonstrated apathy towards these proceedings, a motion was filed in this Court on June 9, 1965, requesting an *en banc* hearing. On June 24, 1965, the Court heard oral arguments on this motion. At the conclusion of these arguments the Court denied the request for an *en banc* hearing.

At the oral hearing on June 24, 1965, the Court granted the Bar Association and the Respondent leave to file further briefs on the issues presented with regard to Charge No. 13. The Bar Association filed its supplemental brief on July 6, 1965, and the Respondent a reply thereto on July 12, 1965.

From a reading of the entire record of the State disbarment proceedings, particularly the testimony of one Charles S. White, an employee of the Association of American Railroads, it seems clear that the genesis of the disbarment proceedings against Respondent was an investigation conducted by agents of the Association of American Railroads. (Tr. 770 to 773.) After the investigation of said Association had been completed, the results were turned over to Attorney Jay Brownlee, then President of the Mahoning County Bar Association.[3] Some time in 1962, charges were filed against the Respondent by the grievance committee of the Mahoning County Bar Association. These charges involved Respondent's relationship with certain persons contacted and interviewed by representatives of the Association of American Railroads in the course of its investigation of the Respondent.

Originally, ten charges were preferred against Respondent. These charges may be briefly summarized as follows:

Charge #1—That Respondent had failed to pay certain costs assessed against him as a result of early disciplinary proceedings.

Charge #2—That Respondent solicited the employment of one Mrs. Clara Beighley of New Castle, Pennsylvania, in a claim against the Baltimore & Ohio Railroad.

Charge #3—That Respondent, acting through an authorized agent, solicited the claim of one Mrs. Naomi Clark against the Baltimore & Ohio Railroad.

Charge #4—That Respondent solicited, through an agent, namely, Michael Orlando, the claim of one Sam Cotellesse against the P. L. & E. Railroad.

Charge #5—That Respondent attempted to solicit, through an agent, namely, Michael Orlando, the claim of

---

2. Except for an appearance on the motion for hearing *en banc* which was filed after hearing on the merits.

3. It seems appropriate to note that Mr. Brownlee has appeared frequently in this Court as the representative of the B. & O. Railroad; but see, Tr. 774 where this line of inquiry was forbidden.

one James F. Quinn against the Baltimore & Ohio Railroad.

Charge #6—That Respondent personally attempted to solicit the claim of Andrew Buletko against the P. L. & E. Railroad.

Charge #7—That Respondent, through an agent, namely, Louis E. McKinney, attempted to solicit the claim of one Mrs. Rakestraw against the Pennsylvania Railroad.

Charge #8—That Respondent advanced certain monies to Mrs. Beighley, Mrs. Clark, and Sam Cotellesse while handling their claims and deducted said advances from settlements of their claims.

Charge #9—That Respondent promised to advance money and later did advance money to one Andrew Masters during the pendency of his case against the Pennsylvania Railroad.

Charge #10—That Respondent was guilty of unprofessional conduct in attempting to influence one Elija Doster in that he endeavored to have Doster sign a false statement that Doster had not been contacted by the Respondent in an effort to have Doster help in the solicitation of the case of Naomi Clark and that at the time Respondent attempted to take said false statement from Doster he paid him the sum of $50.00 in cash.

In the latter part of 1962, a three-member hearing panel was convened for the taking of evidence and for a report on the charges made against Respondent. During the course of this hearing, four additional charges were preferred against the Respondent. These charges may be briefly summarized as follows:

Charge #11—That Respondent attempted to intimidate Samuel Doster who was to appear before the hearing panel and that Respondent gave said Samuel Doster a fifth of whiskey and $5.00 for the purpose of prevailing upon him to prevent his father from appearing as a witness.

Charge #12—That Respondent, through one or more of his agents acting on his behalf, attempted to intimidate witness Andrew Masters by having his agent offer Masters the sum of $300.00 to keep him from appearing before the panel.

Charge #13—That Respondent conspired with Michael Orlando and paid Orlando money for preparing lawsuits against the Baltimore & Ohio Railroad, which was Orlando's employer.

Charge #14—That Respondent, through Michael Orlando, solicited the right to represent Amerzia Montgomery and his wife, Mildred Montgomery, in their claims on behalf of their minor daughter, Sheila.

As is readily apparent, many of the above-summarized charges are of a most serious character.

The proceedings before the three-member panel were lengthy (the record covering 1033 pages), in part extremely bitter,[4] and in content extremely extraordinary. The record of the proceedings is replete with charges of actual or attempted intimidation of witnesses. The record further contains at least one instance of admitted perjury and other instances where persons obviously perjured themselves.

The alleged misconduct on the part of the Respondent with regard to the proceedings themselves is, in large part, reflected in the charges which have been set out above. The charges or indications of misconduct in the prosecution of the Respondent in large part arise out of the involvement of the Association of American Railroads in the proceedings. Generally, the charges made against the Association of American Railroads relate to intimidation of witnesses and the suborning of perjury.

The involvement of the Association of American Railroads in the proceedings was not insignificant, in fact quite prominent; and, as noted above, it is evident that the disbarment proceedings

4. See, for example, Tr. pp. 154, 510, 558 and 758.

grew out of an investigation conducted by said Association. It seems equally evident, from a review of the entire record, that representatives of the Mahoning County Bar relied heavily upon the work of the said Association in the prosecution of the Respondent. In fact, throughout the hearing, the Association had the following four representatives present:

The Assistant Director, J. A. Sherman of Chicago, Illinois;

His Assistant, J. V. Lynch of Memphis, Tennessee;

Investigator, F. N. Van Luit of Rochester, New York; and

Investigator, Charles S. White of Pittsburgh, Pennsylvania.

Were this Court to indulge in innuendo, it would have to conclude that charges made against the Association of American Railroads are credible. To a certain extent the nature of this Association's involvement in disciplinary proceedings is demonstrated by the following quote from a speech given in 1956 by one Kenneth A. Carney, head of the Claims Research Bureau of the Association:

"There have been successfully (sic) disbarment proceedings tried in Oklahoma City, in Chicago, in Ohio, and one of the nice things that I like about all of this is that it is being accomplished in such a way that the bar associations handling these matters are convinced that such action is more in their interest than ours. And their selfish interest is aroused to the point where they have thus far carried the load for us in practically every proceeding that has thus far been instituted." (General Claims Division, Association of American Railroads, 67th Annual Meeting, Shamrock-Hilton Hotel, April 18–20, 1956, Houston, Texas, p. 108.)

This organization's conduct has not escaped unfavorable comment by the courts. In In re Heirich, 10 Ill.2d 357, 140 N.E.2d 825, 67 A.L.R.2d 827 (1956), the Supreme Court of Illinois made the following comments with regard to the involvement of the Association of American Railroads in the prosecution of one B. E. Heirich:

"There seems to be no question but what a group of railroads commenced this prosecution and that they hired George Ericksen to prepare the complaint and secure the evidence. This he proceeded to do without a conscience. We are sure that we are not doing violence to this record when we say that Ericksen, in constructing the case against respondent, was guilty of subornation, bribery, deceit, trickery, entrapment and false impersonation. * * *"

That members of the Association of American Railroads evidently condone the attitude reflected in Mr. Carney's speech certainly does not commend members of said Association to the admiration of the Bar. While it is an obvious truth that the railroads have, over the years, been unjustly injured as a result of unethical practices of some attorneys, and while it is further clear that the railroads have an absolute right to attempt to remedy such injustices, it nonetheless follows that they should not be permitted to use legal ethics or bar associations as a banner under which to unscrupulously advance their own economic self interests.

Other Courts have in the past and will in the future comment adversely upon any bar association or members thereof who become a party to an effort on the part of any special interest group to serve their own interests by or through disciplinary proceedings against members of the Bar. As stated so eloquently by Justice Cardozo in People ex rel. Karlin v. Culkin, 248 N.Y. 465, 162 N.E. 487:

"If the house is to be cleaned, it is for those who occupy and govern it, rather than for strangers, to do the noisome work."

In this vein, the comments of the Supreme Court of Missouri in In re Sizer,

306 Mo. 356, 267 S.W. 922, 924 are very much in point:

"While the charges are nominally filed by officers of the Bar Associations, they were clearly induced by the representatives of the corporations aforesaid. The Bar Associations took up this case at such suggestions. It does not clearly appear in the record, but it can well be inferred from what does appear, that these corporations are financing this case. That they financed Pendell is openly admitted. That they were contributing to a fund at the rate of $50.00 each per month is candidly stated. This much more than paid Pendell and his legitimate expenses. How long these payments were to continue does not appear, but we are but humans, and can draw conclusions from admitted facts. The evidence further discloses that feeling ran high in Kansas City, and an attempt was made to organize another bar association in that city on the pretense that the then present association officers were men largely engaged in protecting corporation clients from damage suits. These lawyers were largely engaged by plaintiffs in damage suits and they proceeded through their investigators to investigate the defending damage suit lawyers and from dissatisfied clients, the evidence shows many affidavits were obtained against some of them. No action was ever taken upon them, however, and the proposed new association never materialized. Sizer & Gardner had nothing to do with the Kansas City move. It clearly appears that the move first started in Kansas City, as stated above, and finally Sizer & Gardner were made the subjects of investigation before the present action. Let us speak plainly, as courts should speak, and say that every earmark of the evidence in this case shows that it is an effort by corporation lawyers as against what they call damage suit lawyers. All this (true as it may be, and as we think it is) does not change this case. The motive for preferring the charges is of small consequence, if, in fact, the charges are sufficient in law, and the respondents are guilty. So that we can concede a contest (upon the one side) by the defending corporation damage suit lawyers and the prosecuting damage suit lawyers upon the other, and the case yet remains as to the sufficiency of the charges and the sufficiency of the proof. If the Bar Associations, sua sponte, had preferred the charges, we would have one background, but where the corporation lawyers of the associations have induced the associations to act upon evidence procured by a special expert, such as Pendell, the background is different. We have to take the picture as it is made to appear. Fifty per month from a long list of interested corporations will cover much more than Pendell got for procuring affidavits. Such is a general outline. In our limited experience at the bar we represented (at different periods) both sides of such cases as are involved here, and we hope not to overdraw inferences from the evidence before us."

At the conclusion of the hearing, the hearing panel found that Charges #3, 8, 9, 10, 11, 12 and 13 had been proved and that Respondent had violated Canons 10, 27, 29 and 32 of the Canons of Professional Ethics. Based on the findings and conclusions of the panel and the record, the Board of Commissioners on Grievances recommended that Respondent be disbarred.

Under the procedures established for disciplinary proceedings, the matter then went before the Supreme Court of Ohio. In Mahoning County Bar Association v. Ruffalo, 176 Ohio St. 263, 199 N.E.2d 396 (1964), the Supreme Court of Ohio made this comment with regard to its responsibility:

"In cases of this kind, the board of commissioners acts for and on be-

half of this court. In doing so, it makes recommendations as to the facts which should be found and the action which should be taken by this court. However, this court has full responsibility for determining what the facts are and what action should be taken on those facts."

On the basis of certain admitted facts, the Ohio Supreme Court, with Judge Herbert dissenting, concluded that Respondent was guilty of a breach of professional ethics with regard to matters contained in Charges #8 and #13.[5] The Court made only one brief reference to the other charges made against the Respondent. In the last paragraph of the per curiam opinion, the Court stated that:

"The members of this court are not in agreement as to whether the facts are as the board of commissioners recommended they should be found with respect to some of the other charges against respondent. However, in view of the admitted facts with regard to charges 8 and 13 and the previous judgment of 1957 and the attitude of respondent with respect thereto, we are of the opinion that respondent should be suspended for an indefinite period from the practice of law."

It is not surprising that the Supreme Court of Ohio did not, on the basis of the record presented, make findings with regard to the other charges. Where, as here, serious charges of misconduct are made; and, where, as here, those charges substantially affect the credibility of all, or nearly all, of the witnesses it would be impossible to make, judiciously, findings of fact without having had the benefit of a personal confrontation with said witnesses.

Since the proceedings in this Court are predicated upon the findings of the Ohio Supreme Court, this Court's consideration will be limited to those charges upon which findings were made by the Ohio Supreme Court.

While, as noted above, the "record" presented to this Court is in many respects distressing, it must nonetheless be noted that the evidence with regard to Charges #8 and #13 is undisputed and, therefore, untainted by charges and countercharges of misconduct in the prosecution of the State disbarment proceedings. This being so, the evidence with regard to Charges #8 and #13 must be viewed outside of the shadow cast by the unresolved charges of misconduct.

In Theard v. United States, 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957) the Supreme Court made the following comments relative to federal disbarment proceedings predicated upon disbarment by a state court:

"While a lawyer is admitted into a federal court by way of a state court, he is not automatically sent out of the federal court by the same route. The two judicial systems of courts, the state judicatures and the federal judiciary, have autonomous control over the conduct of their officers, among whom, in the present context, lawyers are included. The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court. * * *

"Disbarment being the very serious business that it is, ample opportunity must be afforded to show cause why an accused practioner should not be disbarred. If the accusation rests on disbarment by a state court, such determination of course brings title deeds of high respect. But it is not conclusively binding on the federal courts. The recognition that must be accorded such a state judgment and the extent of the responsibility that remains in the federal judiciary were authoritatively expounded in Selling v. Radford, 243

---

5. Judge Gibson, in a concurring opinion, expresses considerable doubt as to some of the conclusions reached by the majority.

U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585. The short of it is that disbarment by federal courts does not automatically flow from disbarment by state courts."

In Selling v. Radford, 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917) the Supreme Court made the following observations relative to the responsibility of the federal judiciary in cases such as the present:

"In other words, in passing upon the question of the right to continue to be a member of the Bar of this court, we think we should recognize the absence of fair private and professional character inherently arising as the result of the action of the supreme court of Michigan so far as we are at liberty to do so consistently with the duty resting upon us to determine for ourselves the right to continue to be a member of this Bar. That is to say, we are of opinion that we should recognize the condition created by the judgment of the state court unless, from an intrinsic consideration of the state record, one or all of the following conditions should appear:

1. That the state procedure, from want of notice or opportunity to be heard, was wanting in due process; 2, that there was such an infirmity of proof as to facts found to have established the want of fair private and professional character as to give rise to a clear conviction on our part that we could not consistently with our duty, accept as final the conclusion on that subject; or 3, that some other grave reason existed which should convince us that to allow the natural consequences of the judgment to have their effect would conflict with the duty which rests upon us not to disbar except upon the conviction that, under the principles of right and justice, we were constrained so to do."

Respondent herein urges that the admitted facts do not constitute a sufficient ground for disciplinary action; and, therefore, "under the principles of right and justice" he should not be disbarred from practice in this court.

### Charge No. 8

The admitted facts with regard to Charge #8 are as follows. Clara Beighley and Naomi Clark were both widowed by the death of their husbands in railroad accidents. Respondent represented both women in actions brought under the Federal Employers' Liability Act. During the period of years in which he represented these women, Respondent from time to time made small advances to both in order that they might meet certain living expenses. The amounts advanced were to be repaid regardless of the outcome of the litigation. Ultimately, the advances were deducted from the proceeds of settlements of their claims. The advances to Mrs. Beighley totaled $1,025.00 and those to Mrs. Clark totaled $711.00.

In holding that the Respondent acted improperly in making the aforementioned advances, the Ohio Supreme Court made, inter alia, the following observations:

"Canon 10 provides:

"The lawyer should not purchase any interest in the subject matter of the litigation which he is conducting.

"Canon 42 reads:

"A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience but subject to reimbursement.

"It is clear that the word, 'expenses' appearing after the semicolon refers to 'expenses of litigation.' It would not include advances of the kind admittedly made by respondent for 'living expenses * * * during the period between the filing of and the trial or disposal of the case.' See opinion No. 288 of the Legal Ethics Committee of the American Bar Association, 41 A.B.A. Journal

33, issue of January 1955. We cannot reconcile the majority opinion in People, ex rel. Chicago Bar Association v. McCallum (1930), 341 Ill. 578, 173 N.E. 827, on this question with Canons 10 and 42.

"It is obvious that, where the advancement of living expenses is made, as in the instant case, to enable a disabled client and his family to survive, any agreement by the disabled client to repay them would not have the effect of providing the attorney with any reasonable source of repayment other than the proceeds received on trial or settlement of his client's claim. In effect, the attorney has purchased an interest in the subject matter of the litigation that he is conducting. The canons contemplate that this will be proper only where the advance is for 'expenses of litigation.' " 176 Ohio St. 263, 264, 265, 199 N.E.2d 396, 398.[6]

In People ex rel. Chicago Bar Association v. McCallum, 341 Ill. 578, 173 N.E. 827 (1930), the Illinois Supreme Court made the following comments with regard to the propriety of advancing funds to needy clients:

"The evidence shows that at various times the McCallums have advanced living expenses to needy clients who had claims for personal injuries against railroad companies where respondent had a fee contract, which was a lien upon any damages which might be recovered upon the injury. In most such cases the clients were unable to work, had no money or property, and their only asset was the claim for damages against the railroad, upon which respondent had a lien. We know of no law which makes it more unethical, under such circumstances, to advance living and medical expenses to the client, and so prevent his becoming a public charge, than it would be, if the client's only asset were a piece of real estate, to advance him, on a mortgage thereon, money for such expense. It is not uncommon for attorneys to commence actions for poor people and make advances of money necessary for the prosecution of the suit upon the credit of the cause. Thus a man in indigent circumstances is enabled to obtain justice in a case where without such aid he would be unable to enforce a just claim. Christie v. Sawyer, 44 N.H. 298; Shapley v. Bellows, 4 N. H. 347, 355. The practice of advancing money to the injured client with which to pay living expenses or hospital bills during the pendency of the case and while he is unable to earn anything may in a sense tend to foment litigation by preventing an unjust settlement from necessity, but we are aware of no authority holding that it is against public policy or of any sound reason why it should be so considered. Johnson v. Great Northern Railway Co., 128 Minn. 365, 151 N.W. 125, L.R.A. 1917B, 1140; Potter v. Ajax Mining Co., 22 Utah 273, 61 P. 999. By canon 42 of the Ethics of the American Bar Association, it is permissible for an attorney to advance costs and court charges for his client, with the understanding that the same are to be ultimately paid by the client."

As the Ohio Supreme Court has itself noted, the above-quoted portion of the Illinois Supreme Court's opinion in People ex rel. Chicago Bar Association v. McCallum, supra, may not be reconciled with the Ohio Supreme Court's per curiam opinion in Mahoning County Bar Association v. Ruffalo.

In McCallum, as in Ruffalo, reference is made to Canon 42. That canon provides as follows:

"A lawyer may not properly agree with a client that the lawyer shall

---

6. The views expressed by the Ohio Supreme Court are nearly identical to those expressed in opinion No. 288 of the Legal

Ethics Committee of the American Bar Association.

pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement."

As the portion of Canon 42 preceding the semicolon provides, an attorney may not properly agree to pay or bear the expenses of litigation. See: Peck v. Heurich, 167 U.S. 624, 17 S.Ct. 927, 42 L. Ed. 302 (1897); Watkins v. Sedberry, 261 U.S. 571, 43 S.Ct. 411, 67 L.Ed. 802 (1923). As may readily be noted, Canon 42 further provides, however, that such expenses may be advanced *subject to reimbursement*.

It seems clear that Canon 42 in its entirety is concerned solely with the specific matter of expenses such as court costs, etc., and not with "living expenses" of the client. In providing that an attorney may, under certain circumstances, properly advance expenses of litigation, Canon 42 neither implicitly or explicitly, provides that advances which are subject to reimbursement, but which are made for other purposes, are otherwise improper.

In Ruffalo, the Ohio Supreme Court, after concluding that the advances in question in effect constituted the purchase of an interest in the subject matter of the litigation, then went on to say that such a "purchase" is proper only to the extent that it covers expenses of litigation. In this Court's opinion, the canons provide no exception to the prohibition contained in Canon 10. To say that the latter portion of Canon 42 provides an exception to Canon 10 in effect is to say that Canon 42 contemplates that any advances subject to reimbursement, including advances of the expenses of litigation, constitute a purchase of an interest in the subject matter of the litigation. In this Court's opinion, such a construction is entirely unwarranted. As the Court has already noted, that portion of Canon 42 following the semicolon merely provides that advances of the expenses of litigation subject to reimbursement are proper, and in no manner indicates that they are otherwise improper. As will subse-

quently be noted, this is not to say, however, that under all circumstances advances subject to reimbursement are actually proper.

In McCallum, the Illinois Supreme Court does not say that the advances there involved were specifically justifiable under Canon 42. Rather, the Court appears merely to be making an analogy between the advances it was considering and the advances authorized by Canon 42.

■ In holding that the Respondent herein purchased an interest in the subject matter of the Beighly and Clark litigation, the Ohio Supreme Court did not hold that all loans to clients are improper. In this regard, the comments of the Connecticut Supreme Court in Grievance Committee of Fairfield County Bar v. Nevas, 139 Conn. 660, 666–667, 96 A.2d 802, 805 (1963) appear to be most pertinent:

"By loaning money to his client, the defendant put himself in a position where his personal interest might well become adverse to hers. The making of such a loan by a lawyer is not, however, necessarily unethical conduct. It is unethical only if the loan is made to accomplish some purpose contrary to the client's welfare or if, in seeking repayment, the lawyer pursues practices which are unfair or unduly oppressive."

Other courts have reached the same conclusion. See: Hildebrand v. State Bar, 18 Cal.2d 816, 824, 117 P.2d 860, 863–864 (1941); Mytton v. Missouri Pacific Railroad Co., Mo.App., 211 S.W. 111 (1919); State ex rel. Florida Bar v. Dawson, Fla., 111 So.2d 427, 430 (1959); and see, also, Mahoning County Bar Association v. Ruffalo, concurring opinion by Gibson, J.:

"Clearly, the existence of an attorney-client relationship does not *ipso facto* make a loan from a lawyer to his client against public policy or contrary to the Canons of Professional Ethics."

This Court concludes that the practice of making loans to clients is not *per se* unethical.

While it would be unethical to promise to make loans in an effort to obtain a prospective client's business, or to accomplish a purpose contrary to the client's interest, or to use unfair tactics in seeking repayment, no such contention was made in the instant case.

The record in this case does not indicate that Respondent was engaged in a wide scale practice of making substantial loans to a large number of his clients. On the contrary, the evidence indicates that Respondent made loans to relatively few clients; that the loans were made after the clients had retained Respondent to represent them; that the loans were made at the request of the client; and that the amounts of the loans were, considering the period over which they were made, not substantial in amount. Under these circumstances, it would be unreasonable to find that the making of these loans by the Respondent constituted a practice calculated to solicit employment by others or as a gimmick to unethically advertise his services.

The question remains as to whether, under the circumstances, the advances in question constituted a purchase of an interest in the subject matter of the litigation. In this regard, it must be noted that the evidence to the effect that the clients had an unconditional obligation to repay the advances is as uncontroverted as the fact that the loans were made. In finding that the advances in question "in effect" constituted a purchase, the Ohio Supreme Court did not find that the obligation of Respondent's clients to repay the advances was in any manner conditional. Rather, the Court merely stated that:

"* * * Where the advancement of living expenses is made, as in the instant case, to enable a disabled client and his family to survive, any agreement by the disabled client to repay them would not have the effect of providing the attorney with any reasonable source of repayment other than the proceeds received on trial or settlement of his client's claim. In effect, the attorney has purchased an interest in the subject matter of the litigation that he is conducting."

The record of the State disbarment proceeding does not contain any direct evidence relative to the ability of Mrs. Beighly and Mrs. Clark to repay the amounts advanced by Respondent out of funds other than those received on trial or settlement of their claims. The record does indicate, however, that at the time the advances were made, said clients were probably in a desperate financial condition. Under these circumstances, it would seem reasonable to infer that it might have been most difficult for the clients to repay the advances out of funds, other than those obtained from the trial or settlement of their cases. It may not, however, in this Court's opinion, be reasonably inferred under these circumstances that it would have been impossible for the clients to repay the advances out of funds which might subsequently have become available from sources other than the trial or settlement of their cases.

It is not in consonance with this Court's concept of justice or the underlying purposes of the Canons of Professional Ethics that a loan otherwise proper is rendered improper because of the indigency of the client. In Reece v. Kyle, 49 Ohio St. 475, 31 N.E. 747, 750, 16 L.R.A. 723, the Ohio Supreme Court made the following comments:

"* * * Beyond this, the propriety of accepting compensation by way of a fee contingent upon the event of the suit, and payable out of the thing recovered, has been recognized; also the advancing by the attorney, for the benefit of the client, of funds in payment of costs and necessary incidental expenses. Indeed, such advances by the attorney in the progress of litigation are so common that to denounce the practice as improper would be to condemn the daily acts of the most

honorable members of the profession. Wylie v. Coxe, 15 How. (U.S.) 415, 14 L.Ed. 753; Stanton v. Embrey, 93 U.S. 548, 23 L.Ed. 983; Allard v. Lamirande, 29 Wis. 502; Newkirk v. Cone, 18 Ill. 449; McDonald v. Chicago & N. W. Railroad Co., 29 Iowa 170, 171; Quint v. Ophir Silver Mining Co., 4 Nev. 305. This upon the idea of duty on the part of the profession to investigate the claims and give professional aid in redressing the wrongs, of the indigent who have been injured, for in this way many poor people are enabled to obtain justice, where, without such aid, they would be remediless. And it has been considered that there is no practical distinction between such an arrangement and one where counsel undertake, for an agreed fee, to be paid in the future, the prosecution of a case for a client so poor that unless the cause be gained the attorney could not possibly realize any compensation whatever. That a contract of the latter kind is legal was held in Moore v. Trustees of Campbell Academy 9 Yerg.(Tenn.) 119. * * * "

In its opinion in Ruffalo, the Ohio Supreme Court, after noting that Reece v. Kyle, supra, was decided prior to its adoption of the Canons of Professional Ethics, made the following comment:

"In view of the adoption of those canons, those cases (including Reece) would no longer be applicable to the extent that they are inconsistent with provisions of the canons."

It appears that under Canon 42 the contract which was before the Ohio Supreme Court in Reece might well be now technically improper. It does not appear, however, that the reasoning in Reece relative to the problems presented in cases involving indigent litigants is in any manner inappropriate or in conflict with the Canons of Professional Ethics.

In his dissenting opinion in Ruffalo, Judge Herbert makes the following pertinent comments relative to the problems confronting the indigent litigant:

"In the case at bar, respondent, over a peroid of years, and with a large clientele according to the relator, gave financial aid to three or four needy clients. The importance of financial aid from his lawyer to an injured workman may spell the difference between injustice and justice.

"For example, a member of a railroad train crew or yard crew is injured or killed by reason of the negligence of the railroad. The injured man or the dependents, through a fiduciary, contract with a lawyer to represent them in negotiations for settlement or in litigation. "The railroad offers a meager totally inadequate settlement—a small percentage of what a lawful judgment could reasonably be expected. In making this inadequate settlement offer, the claims department of the railroad advises that the railroad can delay final decision for years. In short, the powerful can close the doors of the courts to the weak by reason of the lack of finances of the claimant.

"Under the pronouncement in the case at bar, lawyers in Ohio are not permitted to give or loan financial assistance to a client even though the injured employee or the dependents in case of death are in want and hungry."

In Section 542 of the Restatement of Contracts, the following illustration is set forth:

*Illustration No. 2*

"A, an attorney at law, undertakes to prosecute a claim of B, a poor person who has been hurt in an accident. B promises that A shall have one-fourth of the recovery as his fee. A does not agree to pay the expenses of enforcing the claim but knows that he will have to advance

the money needed, since B is without funds. The bargain is not illegal, and A may retain from the amount recovered the agreed fee and also the expenses of enforcement of his claim."

The above-quoted illustration from the Restatement of Contracts merely reflects the traditional attitude of fairness which the courts have taken toward the relationship between attorneys and indigent clients, and is thoroughly consistent with Canon 42.

██ Whether it be the attorney's fee, the expenses of litigation, or unconditional loans, the fact that it might be difficult or unlikely that the client will be able to reimburse the attorney for the same absent a recovery on his claim should not render the attorney's conduct improper. While the Mahoning County Bar Association has urged that a different approach must be taken with regard to loans, it has not presented, nor can this Court discern, any reasonable basis for taking a different approach with regard to the same. The Court finds that the advances made by the Respondent did not constitute the purchase of an interest in the subject matter of the litigation in violation of Canon 10. The Court further finds that the conduct of the Respondent with regard to such advances was not in any other respect improper. Therefore, the conduct complained of does not constitute a ground for disbarment from practice before this Court. To the extent that the Ohio Supreme Court's views in Ruffalo v. Mahoning County Bar Association are different than those expressed herein, the Court respectfully disagrees with the same and declines to follow them.

### CHARGE NO. 13

From 1957 until 1961 Respondent employed one Michael Orlando as an investigator, paying him as follows:

| | |
|---|---|
| 1957 | $2950.00 |
| 1958 | 1250.00 |
| 1959 | 1237.37 |
| 1960 | 3829.25 |
| 1961 | 4716.00 |

During this same period Orlando was also employed by the Baltimore & Ohio Railroad as a car bleeder, that is to say, he was responsible for bleeding air out of train brakes. His hours of employment for the Baltimore & Ohio Railroad were from 11:00 p. m. to 7:00 a. m. His hours of employment for Respondent were during the daytime when he was not employed by the Baltimore & Ohio Railroad. While Respondent admits that Orlando spent some of his time during the five-year period (1957–1961) investigating cases involving the Baltimore & Ohio Railroad, there is no evidence to indicate what percentage of time he was so employed.

It was noted at the outset that among the original charges brought against Respondent were those to the effect that Respondent employed Orlando to solicit cases, and it was further noted that it was not surprising that the Supreme Court of Ohio made no findings with regard to those charges. Almost at the very beginning of the State disbarment proceedings (Tr. 27) the matter of Orlando's employment by Respondent and the adequacy of his payment records were first inquired into, and the same continued to be inquired into from time to time throughout the trial. This line of questioning, the testimony elicited thereon, and the exhibits used were relevant only insofar as they tended to support the solicitation charges. However, much later in the proceedings (Tr. 656 et seq.) members of the hearing panel inquired of Respondent as to the propriety of employing a railroad employee as an investigator in cases where the railroad employer was a party. The inquiry by the panel members in this regard was rather esoteric in nature because they did not inquire into the duties or circumstances of Orlando's employment in any of the cases involving the Baltimore & Ohio Railroad and Respondent's claimants. In any event, in the middle of this colloquy (Tr. 662) counsel for the Bar Association, *relying only on the evidence admitted up to that point* (Tr. 671, 672), moved to add an additional speci-

fication, charging Respondent as follows:

> "That Respondent did conspire with one, Michael Orlando, and paid said Michael Orlando moneys for preparing lawsuits against the B. & O. Railroad, the employer of said Michael Orlando, during all the periods of time extending from 1953 to July of 1961, well knowing that said practice was deceptive in its nature and was morally and legally wrong as respects the employee, Michael Orlando, toward his employer, the B. & O. Railroad Company."

The panel, over vigorous objection of the Respondent on the grounds of timeliness and surprise, allowed the additional charge. Thus the "evidence" introduced on the solicitation charge (which the Ohio Supreme Court, in substance, dismissed) suddenly, without notice, and at least half-way through the trial became relevant to a wholly new charge not theretofore contemplated by any of the parties. The charge Respondent faced at this juncture was one of "conspiracy" to engage in a "deceptive practice" which is "morally * * * and legally wrong as respects the employee, Michael Orlando, toward his employer, the Baltimore & Ohio Railroad."

Notwithstanding the fact that no evidence was admitted to prove that Respondent's employment of Orlando encouraged or resulted in any actual conflict of his duties owed to the Baltimore & Ohio Railroad, this added charge constituted one of the two grounds on which he was indefinitely suspended from the practice of law in Ohio.

At the outset of discussion on this basis for disbarment, it must be noted that the employment of an individual to do work in any manner related to the operations of that individual's regular employer is a practice which might well be fraught with difficulties, and that the regular employer might well be sensitive in this regard. In the present case it is clear that Respondent realized that the Baltimore & Ohio Railroad might cast a jaundiced eye towards Orlando's

employment by Respondent to the extent that it involved investigation of cases to which it was a party. Under these circumstances, it might have been the soundest and most appropriate course of action for the Respondent to have limited Orlando's investigative work to cases other than those involving the Baltimore & Ohio Railroad. While this Court believes that Respondent might not, under these circumstances, have employed the soundest and most appropriate course of action, the question remains as to whether the course of action which Respondent did follow constitutes a ground for disbarment from practice before this Court.

There need be no citation of authority for the principle that an attorney may not, under any circumstances, employ an individual to do work contrary to or in violation of a fiduciary duty that said individual owes to another party. This general principle of law is manifestly inapplicable to the instant case because Orlando clearly owed no fiduciary duty to the Baltimore & Ohio Railroad. Rather, his employment by the Baltimore & Ohio Railroad was of a most menial nature.

The record of the State disbarment proceedings contains very little evidence relative to the exact nature of the activities of Orlando as an investigator for Respondent. The evidence with regard to Orlando's activities as an investigator is summarized in the following statement made by the Respondent:

> "His job specifically has been to investigate cases which I turn over to him to investigate particularly pertaining to railroad cases, to find witnesses, to obtain statements from witnesses, to help me in—and assist me in matters regarding railroad knowledge and the operation of railroads, and on occasion to transport witnesses for me." (Tr. 765)

There is no evidence, nor is there any claim made, that Orlando trespassed upon Baltimore & Ohio Railroad property to obtain information relative to cases

involving the Baltimore & Ohio Railroad.[7] Further, there is no evidence, nor is there any claim made, that Orlando used surreptitious means in order to obtain confidential information held by the Railroad, or, for that matter, that Orlando in any other manner obtained such information. See, In re Noell, 234 Mo.App. 1162, 96 S.W.2d 213 (1936); and In re Newell, 174 App.Div. 94, 160 N.Y.S. 275 (1916).

It is noteworthy that Respondent did not hire Orlando specifically to investigate cases involving the Baltimore & Ohio Railroad. Rather, he hired Orlando to investigate all of his railroad cases. This factor, it would seem, substantially negates any contention that Respondent's employment of Orlando was for the purpose of taking unfair advantage of Orlando's status as an employee of the Baltimore & Ohio Railroad.

As noted above, the employment of an individual to do such investigative work may well be a matter towards which the regular employer will be sensitive. However, in judging the conduct of an attorney the Court must consider the sensitivities and interests of all parties without subservience to any of them. Here we have under attack the conduct of an attorney in his effort to serve the interests of his clients. In the preparation of litigation, counsel for both sides necessarily engage in conduct towards which the other side will be sensitive. This is to be expected in adversary proceedings. Where an attorney is charged with acting contrary to the interests and sensitivities of an opposing party, it would seem that the ultimate and paramount question is not whether the conduct is contrary to the private interests of the opposing party, but, rather, whether the attorney has taken unfair or unethical advantage of the opposing party. In the present case it therefore must be determined whether, under the evidence presented, it has been shown that Respondent, by employing Orlando, took unfair advantage of the Baltimore & Ohio Railroad.

Litigation by its very nature often results in an estrangement of traditional loyalties. Thus, where an employer and an employee become involved in litigation, their respective interests may be diametrically opposed. Both the employer and employee may well believe that the other has taken an unreasonable position, and that in the taking of such an unreasonable position there has been a breach of a mutual duty of fidelity. Even though both parties may be proceeding in the utmost of good faith, such feelings often may not be avoided.

In the investigative aspect of litigation, traditional loyalties are likewise to be strained or distorted. This difficult problem has to a certain extent been met by various legal doctrines adopted by the courts, statutory provisions, and rules of ethics. For example, the various common law and statutory "privileges" have a most significant effect in this area. Rules of ethics, such as Canon 39 of the Canons of Professional Ethics, likewise have a significant effect. That canon provides:

> *"Witnesses*
>
> "A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party. In so doing, however, he should scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand."

Further, Section 60 of 45 U.S.C.A., a statutory provision which has been the

7. In Brotherhood of Railway and Steamship Clerks et al. v. Atlantic Coast Line R.R. Co., D.C., 154 F.Supp. 71 aff'd., 4 Cir., 253 F.2d 753, it was held that a railroad employee may properly be discharged where he allows an investigator to trespass upon company property in order to obtain pictures to be used in litigation against the railroad.

subject of much discussion in this litigation, clearly meets the possible problem of a distorted concept of loyalty. That section provides:

"Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction thereof, be punished by a fine of not more than $1,000 or imprisoned for not more than one year, or by both such fine and imprisonment, for each offense: *Provided,* That nothing herein contained shall be construed to void any contract, rule, or regulation with respect to any information contained in the files of the carrier, or other privileged or confidential reports.

"If any provision of this chapter is declared unconstitutional or the applicability thereof to any person or circumstances is held invalid, the validity of the remainder of the chapter and the applicability of such provision to other persons and circumstances shall not be affected thereby."

It would be a work of supererogation to review all statutory or legal doctrines which, either directly or tangentially, bear upon the problem under consideration. Suffice it to say that the above-mentioned statutory and judicially adopted doctrines are representative of those which bear upon the problem.

It has been a long-standing and accepted practice for corporations to employ persons to investigate claims which their fellow employees have made against their common employer. It is also a long-standing practice for these investigators to aid both inside and outside counsel in litigation which results from such claims. Surely an employee-claimant may personally consider that the employment of such an inside investigator and his use by the corporation's attorneys is not in consonance with mutual duties of fidelity existing between his employer and himself, and between fellow employees. Notwithstanding mutual duties of loyalty, it is clear that the practice of employing such an investigator and the use of his services by the corporation's attorneys is proper.[8] The essential justification for such a practice is that the ultimate purpose of the adversary system (both investigation and litigation functions) is to secure the truth, and, thus, justice. To use the concept of loyalty to preclude efforts to secure the truth is, with certain limitations, a policy which may not be justified.

While the ultimate goal of the investigative function is to secure the truth, it would be naive to even suggest that investigators employed by corporations are always unbiased and objective in their investigation of a particular matter. This fact has not, however, and should not be used as a basis for holding that practice of employing such investigators and the use of their services by a company's attorneys is improper in that it might not always result in its salutary purpose—the truth. Rather, courts have condemned the practice only where it has been shown that it has been unfairly and immorally used.

As indicated above, where an attorney, in representing the interests of his clients, employs as an investigator an in-

---

8. It should go without saying that the same principle applies in many areas of the employer-employee relationship.

dividual who is also employed by a party against whom his clients are making claims, it might well be that said other party will consider the employment of its employee and his use by the attorney as not in consonance with the employee's duty of fidelity. This is not unlike the feeling which an employee might experience when his employer and its attorneys used one of his fellow employees to investigate a claim which the employee has made against his employer. Since the latter practice has never been considered to be *per se* improper, consistent logic dictates that the former practice likewise must not be considered to be *per se* improper. The salutary purpose and the justification for both practices is that they are directed towards the ascertainment of the truth. That both practices are open to abuse is manifest. The point is that while neither practice is *per se* improper, the abuse of either is clearly improper.[9]

In Mahoning County Bar Association v. Ruffalo, supra, the majority opinion seems to take the position that it is *per se* improper for an attorney to employ as an investigator an individual who is also employed by a party against whom his clients are making a claim regardless of that employee's duties for either employer. This Court considers that position to be erroneous and, therefore, respectfully refuses to follow the same.

In light of what has been stated above, the Court finds that Respondent's use of an employee of the Baltimore & Ohio Railroad to investigate cases involving said Railroad was not a practice which was *per se* improper. Notwithstanding the fact that the practice is not *per se* improper, the question arises as to whether it has been shown by competent evidence that Respondent's use of Orlando was otherwise improper. Again, the only evidence with regard to Orlando's actual activities is adequately summarized in the following testimony of the Respondent:

> "His job specifically has been to investigate cases which I turn over to him to investigate particularly pertaining to railroad cases, to find witnesses, to obtain statements from witnesses, to help me in—and assist me in matters regarding railroad knowledge and the operation of railroads, and on occasion to transport witnesses for me." (Tr. 765)

There is no evidence or claim made that Orlando had a fiduciary duty to his employer and that Respondent caused a breach thereof. On the contrary, it is clear that no such fiduciary relationship existed. There is no evidence or claim made that the Respondent either caused Orlando to perform work for the Respondent during the hours when he was employed by the Railroad or that Orlando actually did such work during these hours. There is no evidence or claim made that Respondent either caused Orlando to trespass upon the property of the Baltimore & Ohio Railroad in order to obtain information for Respondent, or that Orlando actually did so trespass. There is no evidence or claim made that Respondent caused Orlando in any manner to influence the testimony of any persons whom he interviewed, or that Orlando actually did attempt to influence such testimony. Further, there is no evidence or claim made that Respondent in any other manner caused Orlando to take unfair advantage of the Baltimore & Ohio Railroad in the performance of his duties as an investigator, or that Orlando so did.[10]

9. During the oral arguments held on April 29, 1965, the Court asked certain questions relative to the principles which have just been discussed. In its brief which was filed after these arguments, the Mahoning County Bar Association completely avoided any discussion of the same.

10. Again, it should be noted that while Respondent was charged with using Orlando to solicit cases, the Ohio Supreme Court did not make findings with regard to said charges; and that this Court will not, under the circumstances previously discussed, make findings with regard to said charges either directly or indirectly.

**450**

■ This Court is of the opinion that the evidence is entirely insufficient to support a finding that Respondent caused Orlando to engage in unfair and unethical practices in the actual investigation of Respondent's cases. Moreover, no contention has been made in this specific regard.

As has previously been noted, the majority opinion in the Mahoning County Bar Association v. Ruffalo, in effect, holds that the employment of Orlando was *per se* improper. During the course of the State disbarment proceedings, Respondent stated that he did not keep detailed records relevant to Orlando's employment for the reason that he feared that the Baltimore & Ohio Railroad might be sensitive towards Orlando's employment by Respondent. In holding that the employment of Orlando was *per se* improper, the Court stated that notwithstanding Respondent's claim that such employment was not *per se* improper, the testimony relevant to Respondent's efforts to protect Orlando showed that he knew such employment was actually improper. This Court, having found that Respondent's conduct was not *per se* improper, and no contention having been made or direct evidence offered that Respondent caused Orlando to engage in unfair and unethical conduct in the actual investigation of Respondent's cases, it may not reasonably be found, on the basis of Respondent's statements to the effect that he was trying to protect Orlando, that Orlando, in effect, acted unfairly or unethically in the actual investigation of Respondent's cases.

This Court finds that Respondent has, under the principles enunciated by the United States Supreme Court in Selling v. Radford, supra, shown cause why he should not be disbarred from practice before this Court.

At the present time disbarment proceedings against the Respondent are pending in the Sixth Circuit Court of Appeals. Since the issues raised in the Sixth Circuit Court of Appeals are identical to those raised here, a final order will be deferred pending a decision by that Court. In the meantime, an order will be entered restoring Respondent to practice before this Court. In the event that the Sixth Circuit Court of Appeals reaches a different conclusion, this Court will reconsider its findings. Otherwise, a final order will be entered consistent with conclusions reached in this memorandum opinion.